D'ORVILLE (BROOKS v.). See Case No. 1,-951.

DOSS (U. S. v.): See Case No. 14,985.

---

## Case No. 4,016.

### Ex parte DOS SANTOS.

[2 Brock. 493.] [1]

Circuit Court, D. Virginia.  Nov. Term, 1835.

EXTRADITION—INTERNATIONAL LAW — POWERS OF FEDERAL JUDICIARY.

1. A foreign government has no right, by the laws of nations, to demand of the government of the United States, a surrender of a citizen or subject of such foreign government, who has committed a crime in his own country, and is afterwards found within the limits of the United States. It is a right which has no existence without, and can only be secured by, a treaty stipulation.

[Cited in Ex parte McCabe, 46 Fed. 370.]

2. But even if the right to demand such surrender existed, independently of a treaty, stipulation, the judicial officers of the United States, have no authority to surrender the obnoxious individual, or to detain him in custody, until a formal demand for the surrender could be made by the foreign government of the executive of the United States. The judicial power of the United States, was created for the purpose of enforcing the laws of the United States, and no authority is conferred upon the federal judiciary, to assist in the execution of the penal laws of a foreign country. The case of piracy is not an exception to this general proposition, for piracy is an offence against all nations, against the United States as well as others, and, moreover, the constitution of the United States, authorizes congress to define and punish piracy.

[Cited in Elk v. Wilkins, 112 U. S. 108, 5 Sup. Ct. 49.]

A bill of indictment was sent to the grand jury at this term, by the district attorney of the United States, against Jose Ferreira dos Santos, a subject of the queen of Portugal, which the grand jury found "not a true bill." As soon as the bill was ignored, and before the prisoner was discharged, the Chevalier de Figaniére d'Morao, chargé des affaires of Portugal, by his counsel, moved the court to detain him in custody until a formal demand for his surrender could be made by the Portuguese government of the executive of the United States. The petitioner alleged, that the prisoner had committed an atrocious murder in Portugal; and this was the ground of the application.

---

[1] [Reported by John W. Brockenbrough, Esq.]

The case was argued by Charles Shirley Carter, on behalf of the chargé des affaires, no counsel appearing for the prisoner.

Mr. Carter said, the grand jury having found the indictment against Jose Ferreira dos Santos, the Portuguese subject now in custody, under the charge of piracy, not a true bill, he stands entitled to an order of discharge, at the hands of this court. Before that order is entered, I now submit to the court, in behalf, and at the instance of the chargé des affaires of Portugal, an application that he may be detained in custody, until time shall be allowed the representative of that nation, to claim of the proper authorities of this government, that he be surrendered as a fugitive from justice, in order to his being remanded to Portugal, to undergo before her tribunals, his trial for·the crime of murder, which he is charged to have perpetrated within her dominions, under the most aggravating circumstances. This application is based upon the common principle, recognised and acted upon by the enlightened of all nations: That flagrant crime ought not to be permitted to go unpunished. What reason can be adduced why a nation should be instrumental in giving impunity to crimes committed in a foreign state, to which its own laws attach capital punishment when committed within its own jurisdiction? To remedy the evil presented in this question, in the absence of any treaty stipulation to the point, the doctrine of the "comity of nations," has immemorially grown up among enlightened nations, at peace with each other, recognising the right of a nation, whose laws have been violated, to claim the surrender of the fugitive violator, who has taken refuge in a foreign state; and the obligation on the part of the foreign power, within whose jurisdiction he is found, to deliver him up, on such demand by the offended nation. This doctrine, although variously laid down by the standard authorities upon international law, it is believed, is recognised by them all. Burlamaqui, following the opinions of Grotius, lays down several propositions to illustrate it: That since the establishment of civil society, it belongs to the sovereign to punish, as he thinks proper, those transgressions of his subjects which properly interest the public: That as a sovereign is not permitted to send armed men into a foreign state to exact punishment, it is reasonable that the sovereign, in whose dominion the offender has taken shelter, should punish the criminal according to his demerits, or deliver him up to be punished at the discretion of the injured sovereign. "This," he says, "is that delivery up, of which we have so many examples in history." He controverts the opinion of Puffendorf, that the right to demand, and the obligation to surrender, a fugitive from justice, "is rather by virtue of some treaty on this head, than in consequence of common and indispensable obligation," and contends, that Puffendorf has therein, without suffi-

cient reason, abandoned the opinion of Grotius. In fine, he asserts, "that a sovereign renders himself guilty of the crime of another, by allowing a retreat and admittance to the criminal, and screening him from punishment." 2 Burl. p. 179, § 23. Vattel sustains the doctrine, in unqualified terms, in relation to great offences. "Assassins, incendiaries, and robbers," he says, "are seized everywhere, at the desire of the sovereign in the place where the crime was committed, and delivered up to his justice." He even asserts the right of an offended nation to demand of a foreign state, the delivery up of one of its own subjects, by whom a flagrant offence has been committed, or to inflict on him exemplary punishment. Vatt. bk. 2, c. 6, §§ 71–77. These are the weighty names by which this doctrine is supported. It is also fortified by the highest modern authorities; whether we look to the ablest elementary writers, or to judicial decisions. Mr. Blackstone admits, that it is left in the power of all states, to take such measures in relation to the admission of strangers, as they may think convenient, and to send them home if necessary. 1 Bl. Comm. 259. And Chitty (1 Cr. Pr. p. 16) holds, "that if a person having committed a felony in a foreign country, comes into England, he may be arrested here, and conveyed, and given up to the magistrates of the country, against the laws of which, the offence was committed." The decisions of the English courts have also been in conformity with the doctrine. In Colonel Lundy's Case, 2 Vent. 314, the defendant was arrested in Scotland, for a capital offence committed in Ireland, and it was held, that he might be sent thither for trial. In Rex v. Kimberley, 2 Strange, 848, the defendant was committed by a single magistrate, for a felony perpetrated in Ireland, "to be detained until there should be proper means found out, to convey him to Ireland to be tried." Strange, in behalf of the prisoner, objected to the legality of the procedure. But the court declared the commitment proper, and remanded the prisoner. The case of East India Co. v. Campbell, 1 Ves. Sr. 246, is to the same effect; where it was adjudged, that one may be sent from England to Calcutta to be tried, for an offence committed there. It is objected by Chief Justice Tilghman, (in an opinion which will be brought to the notice of the court,) that these cases are not in point, as the countries from, and to which, the demand and surrender were made, were under a common dominion. But this objection appears not sustainable; as upon examination it will be found, that the decisions are not placed upon that ground, but looked to the general principles of international law, which (3 Burrows, 1481; 4 Burrows, 2016) constitute a part of the common law of England. Let it be remembered too, that Ireland was a distinct kingdom, at the time of the adjudications in the two cases first cited; which fact is particularly relied

upon by Strange, in Kimberley's Case. And in Campbell's Case, it is distinctly held (1 Ves. Sr. 247) "that the government may send a person to answer for a crime wherever committed, that he may not involve his country, and to prevent reprisals."

Can it be doubted, that, (in the absence of the general statutory provision, making it mandatory,) any one of the states of this Union, would surrender to a sister state a heinous offender, who had escaped beyond the limits and jurisdiction of the state, whose laws had been violated? And yet, in such a case, the surrender could only proceed upon the authority of the doctrine here contended for; that from the comity existing between enlightened and independent states, at peace with each other, there has immemorially arisen a right on the part of one sovereign to demand, and an obligation on the part of the other sovereign to surrender, a common felon, flying from justice. Would a precedent, drawn from the case supposed, be entitled to less weight, than had the surrender been made to a foreign sovereignty? I apprehend not. However this may be, the cases of Rex v. Hutchinson, 3 Keb. 785, where the court refused to bail a man, committed for a murder in Portugal, and of Mure v. Kaye, 4 Taunt. 34, are equally pertinent, and liable to no such objection. In the last mentioned case, the doctrine contended for, is laid down in broad terms, by Heath, J., who cites also the case of a Dutch ship, which was mastered by her crew, and brought into Deal, and it was held that she might be seized, and sent back to Holland. "And the same," he says, "has always been the law of all civilized countries." Nor must I pass over the reasoning of Beccarid, or lose the weight of his authority. In his book on Crimes (page 134, c. 35), he holds this language: "In the whole extent of a political state, there should be no place independent of the laws. Their power should follow every subject, as the shadow follows the body. Sanctuaries, and impunity, differ only in degree; and as the effect of punishments, depends more on their certainty, than their greatness, men are more strongly invited to crimes by sanctuaries, than they are deterred by punishment." And again, "The place of punishment can certainly be no other, than where the crime was committed." From the premises, that sanctuaries should not be allowed, and that the only proper place for punishment is where the crime was committed, it inevitably follows, that a fugitive from broken laws, wheresoever found, ought to be delivered up to be tried by the tribunals, whose just authority he has invaded.

Having taken a survey of the doctrine as it is considered abroad, let us see how it has been regarded in our own country. And here I must remark, that from peculiar political events connected with the early history of this country, the doctrine contended for, is calculated to meet a less favourable reception

from this government, than perhaps, from any other civilized nation. Many of the early settlers in America, were driven from their homes by unrelenting domestic oppression, whether proceeding from party zeal, or religious phrensy. To remand such fugitives to be tried by foreign tribunals, for the crime of free-thinking in matters of politics, or religion, would have been to abandon that liberty, which by their flight, the colonists sought to establish. Among the grievances, so feelingly set forth in our Declaration of Independence, is enumerated, that "of transporting us beyond seas, to be tried for pretended offences." From the date of the Revolution, to the close of the last war, there was no period in which the question of the surrender of subjects, claimed under some pretence or other by the British government, did not agitate the councils, and impart bitterness to the political feelings of our citizens. These events, taken together, have been calculated, I had almost said, to make it a part of the political creed of the American people, to set their faces against the surrender to foreign authority, of any criminal, however atrocious, and under any circumstances, however aggravating. To acknowledge the obligation to surrender, in the instances last referred to, would be to yield the right, set up by Great Britain, which this government never did, and never will admit, to reclaim subjects, wheresoever found, even though engaged in the service of a foreign state; and the right consequent upon it, to invade the sovereignty of a foreign power, by pursuing such subject within her jurisdiction. But this learned court will distinguish between such a question, altogether political in its character, and that doctrine of international law which I am endeavouring to present. As widely do they differ, as the obligation from which we derive the duty to protect, and give a sanctuary to the oppressed, of which we boast; and the obligation to deliver up the guilty, which all enlightened nations acknowledge. It is only necessary for me, in reference to the case at bar, to assert the doctrine in its most limited sense; the surrender of the most flagrant offenders, of those guilty of the "mala in se," the crimes capitally punished by all civilized nations.

Apart from political bias, it will be found that our own courts have not dissented from the learned authorities, which I have relied on. The first case which I find reported, is the case of Respublica v. De Longchamps, 1 Dall. [1 U. S.] 111, which occurred in 1784. The surrender of Longchamps was demanded of the counsel of Pennsylvania, by the French ambassador, for an assault and battery, committed by him, on Monsieur de Marbois, French secretary of legation. The question was referred to the court. M'Kean, C. J. presiding. On deliberation, the surrender of Longchamps was refused: but a sentence in every way satisfactory to the French ambassador, was passed upon Longchamps, by the authorities of Pennsylvania, submitting him to a heavy fine, and two years' imprisonment. In this case, the chief justice uses this language: "We think cases may occur, where counsel could 'pro bono publico,' and to prevent atrocious offenders evading punishment, deliver them up to the justice of the country to which they belong, or where the offences were committed." 1 Dall. [1 U. S.] 116. This is one of the cases cited by C. J. Tilghman, as against the doctrine of surrender. In re Washburn, 4 Johns. Ch. 106, occurred in 1819. In this case, Chancellor Kent, with the great ability which distinguishes his decisions, after taking a minute survey of all the authorities, sustains the doctrine to the fullest extent. "It is," he says, "the law and usage of nations, resting on the plainest principles of justice and public utility, to deliver up offenders charged with felony and other high crimes, and fleeing from the country, in which the crime was committed, into a foreign and friendly jurisdiction." Short's Case, 10 Serg. & R. 131, was decided by Tilghman, C. J., in 1823. There the question was, whether a fugitive from a foreign state, could be arrested by a magistrate in Pennsylvania, on a charge by a private individual, of felony committed abroad, in order to his being surrendered by this government, to be tried by the foreign state. The chief justice decided that he could not; but forbore expressing an opinion whether the executive of the state had power to cause an arrest for the same purpose. He asserts "the undoubted right of every nation, to surrender fugitives from other states." "No man has a right to say, I will force myself upon your protection, and you shall protect me." He, nevertheless, inclines against the doctrine; and cites Lord Coke to sustain him, who (3 Just. Inst. 180) relies upon a text from Deuteronomy—"Non trades servum Domino suo, qui ad te confugerit," a good authority against the surrender of foreign subjects, though not applicable to the surrender of fugitive criminals. The last case which I shall bring to the notice of the court, is the Case of Fisher, 1 Am. Jur. 297, which occurred in Canada, in 1827. In this case C. J. Reid, of king's bench, in an able opinion reviewing those last cited, adopts the reasoning of Chancellor Kent, and properly places out of view the opinions, so much relied upon by Judge Tilghman, of Mr. Jefferson, and other statesmen, (who had upon various occasions been called upon to act on applications for the surrender of foreign subjects,) as political in their character, and not furnishing proper precedents for judicial decision. I confess I have not been able to discover any sound reason against the doctrine, upon which this application is based. It asserts no right to subjects within a foreign state; it invades no foreign jurisdiction; it disallows no foreign sovereignty; it proceeds upon the becoming confidence that all enlightened nations, on terms of peace, will contribute to the promotion of a great com-

mon purpose, interesting to all, ·and obligatory upon·all. to bring flagitious offenders to merited punishment. It is fortified too, by considerations of the soundest policy. It is, indeed, our boast, that under our free institutions, an asylum is afforded to the oppressed of all nations, who fly to our protection. But shall it be extended to the common felon who, having broken the most sacred laws of his own country, has debarred himself from all claim to protection in ours? Will you receive among your peaceful countrymen, the assassin, whose hands are stained with recently shed blood? A regard for their safety forbids it; for, be assured, if you do, as soon as he shall feel himself secure under the too benign influence of your. laws, at the first moment when it may·be done with impunity, like the serpent in the bosom of the honest, but too credulous husbandman, he will aim the deadly blow at the bosoms of your own citizens!

To the argument ·against the doctrine of surrender, as forming part of the law of nations, drawn from the existence of treaties to the same effect, between particular states, it may be remarked. that there is not, perhaps, any principle of international law, however well understood, which may not, at some period, have been made, between friendly powers, the ground of treaty stipulation. The extent and operation of the law of nations, however well described by Grotius or Puffendorf, are always liable·to be ·more closely defined, to be contracted or enlarged by particular agreement, to suit the varying necessities or convenience of different nations: And these treaty provisions are, usually, but declaratory of the general law. To argue the non-existence of the general law from the existence of treaties, would be to make one nation dependent on the treaties of another, and to interfere with the convenience of all, by taking away those principles of natural law, which are mainly resorted to, and relied upon, in their intercourse. by those nations, between which, no particular treaties exist. Is_ the law of nations. upon any point, to be proscribed between Portugal and the United States, because a treaty stipulation defining and modifying the same, as between themselves, exists between the United States and England? Certainly not! If the court is satisfied that the propriety of the demand contemplated by the government of Portugal is established by the authorities which have been adduced, and that it should be followed up by the surrender of the fugitive by the proper authorities of this government, the next question which presents itself is, who are the proper authorities? What is the character of the duty that is to be performed? Is it judicial or executive? Chief Justice Tilghman (10 Serg. & R. 134) says: "The demand of the ·foreign court, ·is addressed to none but the executive, and no other power than the executive, has a right to comply

with that demand." But I am relieved from the necessity of going into argument, or multiplying authorities upon this point, as it has been demonstrated in the celebrated .case of Jonathan Robins [U. S. v. Robins, Case No. 16,175], that the duty is executive and not judicial. The want of ·treaty stipulation, which. existed ·in that case, being supplied here by the doctrine which has been presented, the argument upon the second question in Robins's Case, is equally applicable to the case at bar. Far be it from me to attempt to add a single syllable to that, the most able argument of the distinguished individual who so recently presided in this court. May I be permitted, in passing, to express the sincere veneration with which I regard his great talents and wisdom, (as far as my humble capacity is able to appreciate them,) and the unsurpassed purity of his character and life!

The only remaining question to be considered, is, will not this court so far conform its · action to the doctrine, as· to detain the criminal in custody, until the intended demand, and surrender can .be made? If the positions which I have attempted to establish, be admitted, this would seem·to follow 'of course. Heath, J., uses this language: "By the comity of nations, the country in which the criminal has been found, has aided the police of the country, against which the crime was committed. in bringing the criminal to punishment." Chief Justive Tilghman agrees, "that this matter of delivery up, is an affair of state, in which the judges and inferior magistrates cannot act, but as auxiliary to the executive power." And in Re Washburn, it is distinctly held, "that it is the duty of the civil magistrate to commit the fugitive from justice, to the end, that a reasonable time may be afforded for the government here, to deliver him up, or for the foreign government to make application to the proper authorities here for his surrender; but if no such application is made in a reasonable time. the prisoner will be entitled to his discharge." Indeed, it would be utterly nugatory, to admit the doctrine, and having referred the duty to the executive, to stop short, and deny or question the only means, by which it can be carried into effect. In this case. too, the prisoner is found in the custody of the officers of this court, and subject to its authority. Will the court, under the circumstances, suffer his discharge? I submit the question.

BARBOUR, District Judge. Jose Ferreira dos Santos, a Portuguese subject, ·having been committed·for trial before this court, under a charge of piracy. and the grand jury having found the indictment against him not a true bill, he would be entitled to a discharge from custody, as it regards that accusation. But an application is now made, at the instance of the chargé des affaires of Portugal, that he may be detained,

until the government of Portugal shall have time to make a demand on that of the United States, that he may be surrendered to the former, as a fugitive from justice, to be tried there, under a charge of murder; which it is alleged that he has committed in that country. And the question is, whether it is proper, or competent, for this court to detain him in prison, for the purpose before stated? The solution of this question depends upon that of two others: 1. Has a nation, whose citizen or subject commits a crime within its own jurisdiction, and is afterwards found within that of another, a right, by the law of nations, upon its demand, to have him delivered up by that other, for the purpose of being tried where the crime was committed? 2. If such right exist, have the judicial officers of the United States, supposing the evidence to be sufficient, any authority to act in relation to it, as auxiliary to the executive department?

As to the first point, as far as I am informed, the subject has not been before any of the federal courts of the Union. The case of Jonathan Robins is not an exception to this remark. He was, indeed, at the request of the then president of the United States, Mr. Adams the elder, delivered up by the district judge of South Carolina, to the British consul, on a charge of murder, committed by him, (Robins,) on board of a British vessel on the high seas. But, that case depended upon the twenty-seventh article of the treaty with Great Britain, made in the year 1794, by which it was agreed, that fugitives charged with murder, or forgery, committed within the jurisdiction of either, and seeking an asylum within any of the countries of the other, should be reciprocally delivered up, in the manner and upon the terms therein stated. The question then, in that case, as it relates to this point was, whether the casus foederis of this article had occurred; whereas, in this case, there is no treaty stipulation, and the question must, therefore, depend upon the right of the government of Portugal to make the demand, and the consequent obligation of our government to surrender the person charged, independently of any treaty or compact between them.

There have, however, been two decisions upon the subject, made by two distinguished jurists of our country: the one, by Judge Kent, of New York; the other, by Chief Justice Tilghman, of Pennsylvania; the first, asserting the right (see the case of In re Washburn, 4 Johns. Ch. 106); the other adopting a different line of reasoning, and arriving in many respects, at different conclusions (see the case of Short v. Deacon, 10 Serg. & R. 126). It becomes necessary, then, to examine the question upon the principles laid down by the writers on public law, with reference to the application made of them in the two cases just cited, to the authoritative declarations of our own government, and generally, to all the bearings and relations of the subject. Grotius asserts the right to demand, and the consequent obligation to surrender, all persons charged with crimes, who have fled to another country, whether they are citizens or subjects of that country, or foreigners, although, in practice, it is not insisted on, except in crimes against the state, or of a very heinous nature. As to lesser crimes, he says, they are connived at, unless otherwise agreed on, by treaty. In this doctrine, he is followed by Burlamaqui, Heineccius, and Wynne. Vattel asserts the right and obligation, in case of great crime; but speaks only as to the subjects of the country, on which the demand is made. And his reasoning applies to them only; because it is put upon the principle of the duty of the sovereign to prevent his subjects from doing mischief to other states, and the consequent duty to punish or surrender. Puffendorf, on the contrary, holds the doctrine, that the obligation to deliver up a criminal, is rather in virtue of some treaty, than in consequence of a common and indispensable obligation. Martens, after stating that a sovereign may punish foreigners who fly to his dominions, after having committed a crime in the dominions of another, as well as those who commit it in his, adds: "But in neither, is he perfectly obliged to send them for punishment to their own country, not even supposing them to have been condemned before their escape." He says, also, that according to modern custom, a criminal is frequently sent back to the place where the crime is committed, on the request of a power who offers to do the like service, and that we often see instances of this. Ward seems strongly to countenance the idea of Puffendorf.

I have thus given an abbreviated statement of these writers on public law; more detailed views of whose reasoning may be seen by reference to the works themselves, or to quotations from them, in the two cases before cited from New York and Pennsylvania. Thus much was necessary as a basis for my future reasoning. Upon the mere authority of foreign publicists, then, it would appear to be doubtful whether there was, independently of treaty, any obligation, on the part of our government, to surrender to another, a fugitive from justice. To decide the question, let us descend from these principles of abstract writers, and see what has been the practice of Europe in ancient and modern times. Lord Coke, in his 3 Inst. 180 (I quote now from 10 Serg. & R.), after expressing a decided opinion against delivering up fugitives, gives us three instances of a refusal to deliver up; the first, a qualified one; the two others, absolute. Henry VII. of England, demanded of Ferdinand of Spain, the earl of Suffolk, attainted of high treason by parliament. Ferdinand refused to deliver him, until Henry promised not to put him to death. Henry VIII. of England, demanded of the king of France, Car-

dinal Pool, being his subject, and attainted of treason; the demand was not complied with. Queen Elizabeth, demanded of Henry IV. of France, Morgan and others of her subjects, who had committed treason against her. He replied, that all kingdoms were free to fugitives, and it was the duty of kings to defend, every one, the liberties of his own kingdom; and, that Elizabeth had, not long before, received Montgomery, the prince of Condé, and other Frenchmen. Chief Justice Tilghman adds the case of Perkin Warbeck, who had fled to Scotland, and who was refused to be delivered, although demanded by Henry VII. Chancellor Kent, in the Case of Washburn, cites some cases in England, as settling the principle, and acting on the practice of surrendering fugitives. As to Lundy's Case, 2 Vent. 314, that of Rex v. Kimberley, 2 Strange, 848, there cited, and East India Co. v. Campbell, 1 Ves. Sr. 247, Chief Justice Tilghman, in my opinion, gives a satisfactory answer: It is—that the territories where the crime was committed, and to which the criminal fled, were parts of the same empire, and under one common sovereign. The king of England could have no privilege against the king of Ireland, being one and the same person. He states, indeed, the case of Rex v. Hutchinson, 3 Keb. 785, who was committed on a charge of a crime committed in Portugal, and refused to be bailed, and who it was said by counsel, (in another case,) was sent to Portugal; and he refers to another, mentioned by Heath, J.; the crew of a Dutch ship mastered the vessel, and brought her into Deal: and it was a question whether they should be seized and sent to Holland. And it was held, that they might, and the same (he said) had been the law of all civilized nations. There is no subsequent case cited, and none is known to exist, where the British government has surrendered a fugitive. On the contrary, Mr. Jefferson, in his letter to President Washington, of November 7th, 1791, after speaking on the subject of conventions for the delivery of fugitives, says: "England has no such convention with any nation, and their laws have given no power to their executive, to surrender fugitives of any description; they are, accordingly, constantly refused; and hence, England has been the asylum of the Paolis, the La Mottes, the Calonnes, in short, of the most atrocious offenders, as well as of the most innocent victims, who have been able to get there." In corroboration of this, I will state, that but the other day, that is, on the 7th of November last, it was stated in the Intelligencer, that application had been made to the secretary of the home department, (England), for a warrant to arrest Bowen; but it was refused, on the ground that no treaty stipulation required such a course, and without it, it was wholly inadmissible. The case is not stated with particularity. Enough, however, appears, to show that it was not one of the atrocious class, mentioned by Grotius; that, however, is not stated as the reason, but the want of a treaty stipulation. I am not prepared to say, how far the secretary acted upon the principle stated in some of the books, that governments were in the practice of conniving at the lesser offences, or that the demand was not made by our government.

There is, indeed, a case in Canada, in 1829, where a criminal from Vermont was delivered to the authorities of that state, upon a charge of larceny committed there, upon a warrant issued by the governor of the province; he was arrested, and on habeas corpus, before the chief justice, it was held lawful: in his opinion, he grounds himself generally upon the authorities and cases before stated, and his decision, therefore, must stand or fall with them. It is worthy of remark, however, that this was a case of simple larceny, and not one of great atrocity, as described by Grotius, and moreover, that the arrest was grounded upon a charge, on oath, of the felony, and not upon a demand by our government; so that it would seem, that the opinion of the government at home, differed from that in the province of Canada. The opinion of European nations on this subject, is manifested by the numerous treaties made by them, containing provision for the mutual surrender of criminals. In 1 Kent, Comm. p. 37, we are told, that treaties of this kind were made between England and Scotland in 1174, and England and France in 1308, and France and Savoy in 1378. As these were in the comparatively barbarous ages of Europe, let us come down to a period, when civilization had reached a high point. In the letter of Mr. Jefferson, before referred to, dated in 1791, he says: "The delivery of fugitives from one country to another, as practiced by several nations, is in consequence of conventions settled between them, defining precisely the cases wherein such deliveries shall take place. I know (says he) that such conventions exist, between France and Spain, France and Sardinia, France and Germany, France and the United Netherlands; between the several sovereigns, constituting the Germanic body, and I believe very generally, between co-terminous states, on the continent of Europe." Why, let me ask, were all these treaties in ancient and modern times? I answer, either because the opinion of Puffendorf was considered right, that without a treaty stipulation, there was no obligation to surrender, or at least, the question was so unsettled, the respective rights and obligations of nations so indeterminate, and the refusal on the part of nations to surrender so frequent, that without treaty, there was no obligation at all, or none of any sort of practical value; for, what is this imperfect obligation of which the writers speak? It is the right of one to ask, which involves the right of the other to refuse, and as applied to this particular subject, that refusal had become so common, as

to be almost the habitual practice, until treaties were formed concerning it. And is not the doctrine of the necessity of treaty stipulation supported, too, by the weightiest reasons? In the first place, in this way alone, can reciprocity be ensured; in this way alone, can it certainly be ascertained to what crimes the doctrine of surrender is to be applied. Some would apply it to all crimes, some to those against the state, or of deep atrocity. Which are of that character? The New York assembly consider simple larceny, or any crime, punishable in their state prison, as proper to surrender for; and have enacted accordingly. The treaty of 1794, between the United States and Great Britain, confines it to murder and forgery. Moreover, as to the expense attending the case, in the treaty just cited, it is provided, that the power making the demand shall pay it. Finally, provision can be made as to the length of time for which a party is to be detained, as is provided in the act of congress in relation to fugitives from justice, from the several states.

Let us now examine the views of our own government, on this point. Mr. Jefferson, in the letter already referred to, in which he is writing to the president on the subject of a request from the government of South Carolina, that a demand should be made upon the governor of Florida, for the delivery of some fugitives, says: "The laws of the United States, like those of England, receive every fugitive, (that is, as he had just before expressed it, the most atrocious offenders, as well as the most innocent victims,) and no authority has been given to our executives to deliver them up." He states further, that the French government had been anxious to make a convention with us, authorizing them to demand their subjects coming here; that in the consular convention, Dr. Franklin agreed to an article, giving to their consuls a right to take and send back captains of vessels, mariners, and passengers. Congress refused to ratify it, until the word "passengers" was stricken out. He goes on to say, in fact, however desirable it be, that the perpetrators of crimes, acknowledged to be such by all mankind, should be delivered up to punishment; yet, it is extremely difficult to draw the line between those, and acts rendered criminal by tyrannical laws only; hence, the first step always is, a convention defining the cases where a surrender shall take place. "If, then, the United States, (he continues), could not deliver up to Governor Quesnada, a fugitive from the laws of his country, we cannot claim, as a right, the delivery of fugitives from us; and it is worthy of consideration, whether the demand proposed to be made in Governor Pinckney's letter, should it be complied with by the other party, might not commit us disagreeably, perhaps dishonourably, in event; for I do not think, that we can take for granted, that

the legislature of the United States will establish a convention for the mutual delivery of fugitives; and without a reasonable certainty that they will, I think we ought not to give Governor Quesnada any grounds to expect that, in a similar case, we would redeliver fugitives from his government."

On the 12th September, 1793, Mr. Jefferson thus writes to Genet, the French minister, in answer to a demand that he had made for the delivery of fugitives: "The laws of this country take no notice of crimes committed out of their jurisdiction. The most atrocious offender coming within their pale, is received by them as an innocent man; and they have authorized no one to seize or deliver him. The evil of protecting malefactors of every dye, is sensibly felt here, as in other countries; but, until a reformation of the criminal codes of most nations, to deliver fugitives from them, would be, to become their accomplices. The former, therefore, is viewed as the lesser evil." He goes on to say, that unless they come within the consular convention, no person in this country is authorized to deliver them; but on the contrary, they are under the protection of the laws, &c. In the course of the next year, (1794), the British treaty was made; the twenty-seventh article of which, already referred to, provided for this subject. Thus, as well by the authoritative declarations, as by the acts of our government, the principle has been announced to the world, that the United States acknowledge no obligation to surrender fugitives, except by virtue of some treaty stipulation. Besides the reasons common to us, with other nations which recommend the justice and utility of this doctrine, we have strong ones arising from the spirit of our institutions, and the provisions of the federal constitution. If, for example, we were to take Grotius as our rule, the offence which he emphatically considers as most requiring a surrender, is treason; or, as he expresses it, offences against the state. Now, let us see what would be the practical effect of this rule? Suppose, that during the late war with Great Britain, a British born subject, who had previously emigrated to the United States, had been found fighting in our ranks, as a soldier, in Canada, and upon his return home, had been demanded by the British government: on their principle of perpetual allegiance, he was still a subject, and had committed treason; upon the principle of Grotius, we must have surrendered him, because he had committed, according to their laws, a crime against the state.

Let us put another case. Suppose that, in the struggle now going on in Texas, an American citizen (of whom we have many) should be found fighting against the authority of Santa Anna, and upon his return home should be demanded. Here, too, according to the rule of Grotius, we must de-

liver him, because he had committed a crime of state, against the present government de facto; and it is a settled principle with us, that we are always to take the present existing government de facto, as the one for the time being to be respected as the government. Can any one for a moment suppose, that in either of the cases here put, our government would surrender? Surely not. In the case in Canada, the chief justice says, that cases of this sort cannot be drawn into precedent, because the authority of the state to which the accused has fled, may well be extended to protect, rather than deliver him up to his accusers, &c.; but is it not apparent, that this is a violation of Grotius's rule? For here is a crime of state committed against the government de facto; one which, if successful, is honoured by the name of revolution; if otherwise, is degraded by the epithet of rebellion, and all engaged in it are called traitors. An attention to some of the provisions of our constitution, will, I think, fortify this doctrine. The second clause of the second section of the fourth article provides, that a person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime. The subject of fugitives from justice was thus in the minds of the convention, and they provided for a delivery of fugitives from the states of the Union. It may, perhaps, be fairly said, that as the constitution was made for the states, and the people of the states, it had no relation in its nature to foreigners: be it so; but the principle assumed, requires us to deliver up citizens, as well as aliens. In this aspect as to citizens, it was properly within the scope of a constitutional provision; and, according to my view, provision is made in the constitution, which, although it does not mention it by name, embraces the whole subject, both as to citizens and all others within our jurisdiction, and puts it within the control of a department of the government. It is the clause creating the treaty-making power, and the reasoning stands thus: the constitution having given to the president and senate the right to make treaties, without limitation in words, there is no other limitation but their discretion, except that the treaty shall not contravene the constitution, or invade the rights of other departments. The various provisions, securing to every person charged with crime, a trial by jury, the right to be confronted by his witnesses, the privilege of not being obliged to be a witness against himself, also, in my opinion, have an important bearing upon this subject. It may be said, that it was intended to apply to crimes against the United States; but, I think, the spirit of them should make the treaty-mak-

ing power extremely cautious, even as to treaty stipulations, for surrendering our people to a government, where these privileges do not exist; but where there is no treaty, they should, in my opinion, be decisive against a surrender, in the exercise of discretion, even if the law of nations created an imperfect obligation, without a treaty stipulation. I am of opinion, then, that the government of the United States are not under any obligation to deliver the prisoner, in the absence of any treaty stipulation.

The second question is, whether the judicial officers of the United States have any authority to act in relation to it?' Perhaps the conclusion at which I have arrived on the first point, might render a discussion of the other unnecessary; but as it was argued, and has been considered, and as I may have fallen into error on the first point, I will very briefly notice it. As a general proposition, the judicial power of a government is created for the purpose of executing its own laws. If in deciding upon a foreign contract, the courts of another country construe it according to the law of the place where made, and intended to be executed; as, for example, to give the interest there allowed, this is not the execution of a foreign law; but of the law of the court, which as to this case, adjudges that as the intention of the parties. As to criminal laws, I believe it is settled every where, that one country will not execute the penal laws of another; not even its revenue laws. So far is this carried in this country, that the courts of one state will not execute the penal laws, either of a sister state, or of the federal government. The crime charged against the prisoner, is one against the laws of Portugal, not against the United States. Over the crime itself, then, the judicial officers of the United States clearly have no jurisdiction. If they have no jurisdiction over the crime, whence can they derive the authority to arrest the party charged with that crime, and detain him, with a view to a trial therefor, in another and foreign jurisdiction? I do not here enter into the second question discussed in Jonathan Robins' Case, whether the duty to be performed there, was a judicial one. That was the case of a treaty. The constitution extends the jurisdiction of its judiciary, to all cases arising under treaties, &c. That, therefore, is a totally distinct question from this, where there is no treaty, and where a judicial officer is asked to arrest, or, what is the same thing, to detain a person charged with the commission of a crime, not against the government, whose judicial power it is his duty to execute, nor for a trial, in any of the courts of that government, but for one to be had before the tribunals of a foreign country, against whose laws the alleged crime has been committed.

Let us look, for a moment, at the legislation of congress, upon the subject of arrest in criminal cases. We are authorized to arrest

for any crime or offence against the United States, for what purpose? The act of congress informs us, that it is for trial before such court of the United States, as by that act has cognizance of the offence. Now, the crime with which this prisoner is charged, is not against the United States, and the arrest or detainer is avowedly asked, not for the purpose of a trial before any court of the United States. The case of piracy is embraced by the provision of this law; for that is a crime against all nations, and amongst others, against the United States; but, moreover, the constitution authorizes congress to define and punish piracy. Congress has defined and provided for its punishment. We are, then, executing a law, made in pursuance of the constitution, when we take jurisdiction of that offence. So strict has been the doctrine, as to the judicial officers of one government executing the criminal laws of another, that, although the act of congress authorizes state magistrates to arrest, for crimes against the United States, yet the general court of Virginia sustained the legality of their warrants, only upon the ground, that it was competent to have authorized private persons to act, and that magistrates are designated as a class of persons by their name of office.

In conclusion I will say, that the counsel who made this application, has presented it in the strongest light, which the principles of public law or the authorities enabled him to do; yet, after the best reflection which I have been able to bestow upon the subject, in the short time which I have had to consider it, I am of opinion, that, without a treaty stipulation, this government is not under any obligation to surrender a fugitive from justice, to another government, for trial; and that, as a judicial officer of the United States, I have no authority whatsoever, either to arrest or detain, with a view to such surrender. It follows, as a consequence, that the prisoner is entitled to his discharge; and he is discharged accordingly.