## ELK *v.* WILKINS.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

Argued April 28, 1884.—Decided November 8, 1884.

An Indian, born a member of one of the Indian tribes within the United States, which still exists and is recognized as a tribe by the government of the United States, who has voluntarily separated himself from his tribe, and taken up his residence among the white citizens of a State, but who has not been naturalized, or taxed, or recognized as a citizen, either by the United States or by the State, is not a citizen of the United States, within the meaning of the first section of the Fourteenth Article of Amendment of the Constitution.

A petition alleging that the plaintiff is an Indian, and was born within the United States, and has severed his tribal relation to the Indian tribes, and fully and completely surrendered himself to the jurisdiction of the United States, and still so continues subject to the jurisdiction of the United States, and is a *bona fide* resident of the State of Nebraska and city of Omaha, does not show that he is a citizen of the United States under the Fourteenth Article of Amendment of the Constitution.

This is an action brought by an Indian, in the Circuit Court of the United States for the District of Nebraska, against the registrar of one of the wards of the city of Omaha, for refusing to register him as a qualified voter therein. The petition was as follows:

"John Elk, plaintiff, complains of Charles Wilkins, defendant, and avers that the matter in dispute herein exceeds the sum of five hundred dollars, to wit, the sum of six thousand dollars, and that the matter in dispute herein arises under the Constitution and laws of the United States; and, for cause of action against the defendant, avers that he, the plaintiff, is an Indian, and was born within the United States; that more than one year prior to the grievances hereinafter complained of he had severed his tribal relation to the Indian tribes, and had fully and completely surrendered himself to the jurisdiction of the United States, and still so continues subject to the jurisdiction of the United States; and avers that, under and by virtue of the Fourteenth Amendment to the Constitution of the United States, he is a citizen of the United States, and entitled to the right and privilege of citizens of the United States.

"That on the sixth day of April, 1880, there was held in the city of Omaha, (a city of the first class, incorporated under the general laws of the State of Nebraska providing for the incorporation of cities of the first class,) a general election for the election of members of the city council and other officers for said city.

"That the defendant, Charles Wilkins, held the office of and acted as registrar in the fifth ward of said city, and that as said registrar it was the duty of such defendant to register the names of all persons entitled to exercise the elective franchise in said ward of said city at said general election.

"That this plaintiff was a citizen of and had been a *bona fide* resident of the State of Nebraska for more than six months prior to said sixth day of April, 1880, and had been a *bona fide* resident of Douglas County, wherein the city of Omaha is situate, for more than forty days, and in the fifth ward of said city more than ten days prior to the said sixth day of April, and was such citizen and resident at the time of said election, and at the time of his attempted registration, as hereinafter set forth, and was in every way qualified, under the laws of the State of Nebraska and of the city of Omaha, to be registered as a voter and to cast a vote at said election, and complied with the laws of the city and State in that behalf.

"That on or about the fifth day of April, 1880, and prior to said election, this plaintiff presented himself to said Charles Wilkins, as such registrar, at his office, for the purpose of having his name registered as a qualified voter, as provided by law, and complied with all the provisions of the statutes in that regard, and claimed that, under the Fourteenth and Fifteenth Amendments to the Constitution of the United States, he was a citizen of the United States, and was entitled to exercise the elective franchise, regardless of his race and color ; and that said Wilkins, designedly, corruptly, wilfully and maliciously, did then and there refuse to register this plaintiff, for the sole reason that the plaintiff was an Indian, and therefore not a citizen of the United States, and not, therefore, entitled to vote, and on account of his race and color, and with the wilful, malicious, corrupt and unlawful design to deprive this plaintiff of his right to vote at said election, and of his rights, and all other Indians of their rights, under said Fourteenth and Fifteenth Amendments to the Constitution of the United States, on account of his and their race and color.

"That on the sixth day of April this plaintiff presented himself at the place of voting in said ward, and presented a ballot and requested the right to vote, where said Wilkins, who was then acting as one of the judges of said election in said ward, in further carrying out his wilful and malicious designs aforesaid, declared to the plaintiff and to the other election officers that the plaintiff was an Indian and not a citizen and not entitled to vote, and said judges and clerks of election refused to receive the vote of the plaintiff, for that he was not registered as required by law.

"Plaintiff avers the fact to be that by reason of said wilful, unlawful, corrupt and malicious refusal of said defendant to register this plaintiff, as provided by law, he was deprived of his right to vote at said election, to his damage in the sum of $6,000.

"Wherefore plaintiff prays judgment against defendant for $6,000, his damages, with costs of suit."

The defendant filed a general demurrer for the following causes : 1st. That the petition did not state facts sufficient to

constitute a cause of action. 2d. That the court had no juris-
diction of the person of the defendant. 3d. That the court
had no jurisdiction of the subject of the action.

The demurrer was argued before Judge McCrary and Judge
Dundy, and sustained; and the plaintiff electing to stand by
his petition, judgment was rendered for the defendant, dis-
missing the petition with costs. The plaintiff sued out this
writ of error.

By the Constitution of the State of Nebraska, article 7, sec-
tion 1, " Every male person of the age of twenty-one years or
upwards, belonging to either of the following classes, who
shall have resided in the State six months, and in the county,
precinct or ward for the term provided by law, shall be an
elector. First. Citizens of the United States. Second. Persons
of foreign birth who shall have declared their intention to be-
come citizens, conformably to the laws of the United States on
the subject of naturalization, at least thirty days prior to an
election."

By the statutes of Nebraska, every male person of the age
of twenty-one years or upwards, belonging to either of the
two classes so defined in the Constitution of the State, who
shall have resided in the State six months, in the county forty
days, and in the precinct, township or ward ten days, shall be
an elector; the qualification of electors in the several wards of
cities of the first class (of which Omaha is one) shall be the
same as in precincts; it is the duty of the registrar to enter in
the register of qualified voters the name of every person who
applies to him to be registered, and satisfies him that he is
qualified to vote under the provisions of the election laws of
the State; and at all municipal, as well as county or State
elections, the judges of election are required to check the
name, and receive and deposit the ballot, of any person whose
name appears on the register. Compiled Statutes of Nebraska
of 1881, ch. 26, § 3 ; ch. 13, § 14; ch. 76, §§ 6, 13, 19.

*Mr. A. J. Poppleton* and *Mr. John L. Webster* for plaintiff
in error.

*Mr. G. M. Lambertson* for defendant in error.

MR. JUSTICE GRAY delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

The plaintiff, in support of his action, relies on the first clause of the first section of the Fourteenth Article of Amendment of the Constitution of the United States, by which "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside;" and on the Fifteenth Article of Amendment, which provides that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

This being a suit at common law, in which the matter in dispute exceeds $500, arising under the Constitution of the United States, the Circuit Court had jurisdiction of it under the act of March 3, 1875, ch. 137, § 1, even if the parties were citizens of the same State. 18 Stat. 470; *Ames* v. *Kansas*, 111 U. S. 449. The judgment of that court, dismissing the action with costs, must have proceeded upon the merits, for, if the dismissal had been for want of jurisdiction, no costs could have been awarded. *The Mayor* v. *Cooper*, 6 Wall. 247; *Mansfield & Coldwater Railway* v. *Swan*, 111 U. S. 379. And the only point argued by the defendant in this court is whether the petition sets forth facts enough to constitute a cause of action.

The decision of this point, as both parties assume in their briefs, depends upon the question whether the legal conclusion, that under and by virtue of the Fourteenth Amendment of the Constitution the plaintiff is a citizen of the United States, is supported by the facts alleged in the petition and admitted by the demurrer, to wit: The plaintiff is an Indian, and was born in the United States, and has severed his tribal relation to the Indian tribes, and fully and completely surrendered himself to the jurisdiction of the United States, and still continues to be subject to the jurisdiction of the United States, and is a *bona fide* resident of the State of Nebraska and city of Omaha.

The petition, while it does not show of what Indian tribe the plaintiff was a member, yet, by the allegations that he " is

an Indian, and was born within the United States," and that " he had severed his tribal relation to the Indian tribes," clearly implies that he was born a member of one of the Indian tribes within the limits of the United States, which still exists and is recognized as a tribe by the government of the United States. Though the plaintiff alleges that he "had fully and completely surrendered himself to the jurisdiction of the United States," he does not allege that the United States accepted his surrender, or that he has ever been naturalized, or taxed, or in any way recognized or treated as a citizen, by the State or by the United States. Nor is it contended by his counsel that there is any statute or treaty that makes him a citizen.

The question then is, whether an Indian, born a member of one of the Indian tribes within the United States, is, merely by reason of his birth within the United States, and of his afterwards voluntarily separating himself from his tribe and taking up his residence among white citizens, a citizen of the United States, within the meaning of the first section of the Fourteenth Amendment of the Constitution:

Under the Constitution of the United States, as originally established, " Indians not taxed " were excluded from the persons according to whose numbers representatives and direct taxes were apportioned among the several States; and Congress had and exercised the power to regulate commerce with the Indian tribes, and the members thereof, whether within or without the boundaries of one of the States of the Union. The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal, as they thought fit, either through treaties made by the President and Senate, or through acts of Congress in the ordinary forms of legislation. The members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States. They were in a dependent condition, a state of pupilage, resembling that of a ward to his guardian. Indians and their property, exempt from taxation by treaty or statute of the United States, could not be taxed

by any State. General acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them. Constitution, art. 1, sects. 2, 8 ; art. 2, sect. 2 ; *Cherokee Nation* v. *Georgia,* 5 Pet. 1 ; *Worcester* v. *Georgia,* 6 Pet. 515 ; *United States* v. *Rogers,* 4 How. 567 ; *United States* v. *Holliday,* 3 Wall. 407 ; *Case of the Kansas Indians,* 5 Wall. 737 ; *Case of the New York Indians,* 5 Wall. 761 ; *Case of the Cherokee Tobacco,* 11 Wall. 616 ; *United States* v. *Whiskey,* 93 U. S. 188 ; *Pennock* v. *Commissioners,* 103 U. S. 44 ; *Crow Dog's Case,* 109 U. S. 556 ; *Goodell* v. *Jackson,* 20 Johns. 693 ; *Hastings* v. *Farmer,* 4 N. Y. 293.

The alien and dependent condition of the members of the Indian tribes could not be put off at their own will, without the action or assent of the United States. They were never deemed citizens of the United States, except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens on application to a court of the United States for naturalization, and satisfactory proof of fitness for civilized life ; for examples of which see treaties in 1817 and 1835 with the Cherokees, and in 1820, 1825 and 1830 with the Choctaws, 7 Stat. 159, 211, 236, 335, 483, 488 ; *Wilson* v. *Wall,* 6 Wall. 83 ; Opinion of Attorney-General Taney, 2 Opinions of Attorneys General, 462 ; in 1855 with the Wyandotts, 10 Stat. 1159 ; *Karrahoo* v. *Adams,* 1 Dillon, 344, 346 ; *Gray* v. *Coffman,* 3 Dillon, 393 ; *Hicks* v. *Butrick,* 3 Dillon, 413 ; in 1861 and in March, 1866, with the Pottawatomies, 12 Stat. 1192 ; 14 Stat. 763 ; in 1862 with the Ottawas, 12 Stat. 1237 ; and the Kickapoos, 13 Stat. 624 ; and acts of Congress of March 3, 1839, ch. 83, § 7, concerning the Brothertown Indians, and of March 3, 1843, ch. 101, § 7, August 6, 1846, ch. 88, and March 3, 1865, ch. 127, § 4, concerning the Stockbridge Indians, 5 Stat. 351, 647 ; 9 Stat. 55 ; 13 Stat. 562. See also treaties with the Stockbridge Indians in 1848 and 1856, 9 Stat. 955 ; 11 Stat. 667 ; 7 Opinions of Attorneys General, 746.

Chief Justice Taney, in the passage cited for the plaintiff

from his opinion in *Scott* v. *Sandford,* 19 How. 393, 404, did not affirm or imply that either the Indian tribes, or individual members of those tribes, had the right, beyond other foreigners, to become citizens of their own will, without being naturalized by the United States. His words were : " They " (the Indian tribes) " may, without doubt, like the subjects of any foreign government, be naturalized by the authority of Congress, and become citizens of a State, and of the United States ; and if an individual should leave his nation or tribe, and take up his abode among the white population, he would be entitled to all the rights and privileges which would belong to an emigrant from any other foreign people." But an emigrant from any foreign State cannot become a citizen of the United States without a formal renunciation of his old allegiance, and an acceptance by the United States of that renunciation through such form of naturalization as may be required by law.

The distinction between citizenship by birth and citizenship by naturalization is clearly marked in the provisions of the Constitution, by which " no person, except a natural born citizen, or a citizen of the United States at the time of the adoption of this Constitution, shall be eligible to the office of President ; " and " the Congress shall have power to establish an uniform rule of naturalization." Constitution, art. 2, sect. 1 ; art. 1, sect. 8.

By the Thirteenth Amendment of the Constitution slavery was prohibited. The main object of the opening sentence of the Fourteenth Amendment was to settle the question, upon which there had been a difference of opinion throughout the country and in this court, as to the citizenship of free negroes (*Scott* v. *Sandford,* 19 How. 393); and to put it beyond doubt that all persons, white or black, and whether formerly slaves or not, born or naturalized in the United States, and owing no allegiance to any alien power, should be citizens of the United States and of the State in which they reside. *Slaughter-House Cases,* 16 Wall. 36, 73 ; *Strauder* v. *West Virginia,* 102 U. S. 303, 306.

This section contemplates two sources of citizenship, and two sources only : birth and naturalization. The persons declared

to be citizens are "all persons born or naturalized in the United States, and subject to the jurisdiction thereof." The evident meaning of these last words is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance. And the words relate to the time of birth in the one case, as they do to the time of naturalization in the other. Persons not thus subject to the jurisdiction of the United States at the time of birth cannot become so afterwards, except by being naturalized, either individually, as by proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired.

Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indian tribes (an alien, though dependent, power), although in a geographical sense born in the United States, are no more "born in the United States and subject to the jurisdiction thereof," within the meaning of the first section of the Fourteenth Amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations.

This view is confirmed by the second section of the Fourteenth Amendment, which provides that "representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." Slavery having been abolished, and the persons formerly held as slaves made citizens, this clause fixing the apportionment of representatives has abrogated so much of the corresponding clause of the original Constitution as counted only three-fifths of such persons. But Indians not taxed are still excluded from the count, for the reason that they are not citizens. Their absolute exclusion from the basis of representation, in which all other persons are now included, is wholly inconsistent with their being considered citizens.

So the further provision of the second section for a propor-

tionate reduction of the basis of the representation of any State in which the right to vote for presidential electors, representatives in Congress, or executive or judicial officers or members of the legislature of a State, is denied, except for participation in rebellion or other crime, to "any of the male inhabitants of such State, being twenty-one years of age and citizens of the United States," cannot apply to a denial of the elective franchise to Indians not taxed, who form no part of the people entitled to representation.

It is also worthy of remark, that the language used, about the same time, by the very Congress which framed the Fourteenth Amendment, in the first section of the Civil Rights Act of April 9, 1866, declaring who shall be citizens of the United States, is "all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed." 14 Stat. 27; Rev. Stat. § 1992.

Such Indians, then, not being citizens by birth, can only become citizens in the second way mentioned in the Fourteenth Amendment, by being "naturalized in the United States," by or under some treaty or statute.

The action of the political departments of the government, not only after the proposal of the Amendment by Congress to the States in June, 1866, but since the proclamation in July, 1868, of its ratification by the requisite number of States, accords with this construction.

While the Amendment was pending before the legislatures of the several States, treaties containing provisions for the naturalization of members of Indian tribes as citizens of the United States were made on July 4, 1866, with the Delawares, in 1867 with various tribes in Kansas, and with the Pottawatomies, and in April, 1868, with the Sioux. 14 Stat. 794, 796; 15 Stat. 513, 532, 533, 637.

The treaty of 1867 with the Kansas Indians strikingly illustrates the principle that no one can become a citizen of a nation without its consent, and directly contradicts the supposition that a member of an Indian tribe can at will be alternately a citizen of the United States and a member of the tribe.

That treaty not only provided for the naturalization of mem-

bers of the Ottawa, Miami, Peoria, and other tribes, and their families, upon their making declaration, before the District Court of the United States, of their intention to become citizens; 15 Stat. 517, 520, 521; but, after reciting that some of the Wyandotts, who had become citizens under the treaty of 1855, were "unfitted for the responsibilities of citizenship;" and enacting that a register of the whole people of this tribe, resident in Kansas or elsewhere, should be taken, under the direction of the Secretary of the Interior, showing the names of "all who declare their desire to be and remain Indians and in a tribal condition," and of incompetents and orphans as described in the treaty of 1855, and that such persons, and those only, should thereafter constitute the tribe; it provided that "no one who has heretofore consented to become a citizen, nor the wife or children of any such person, shall be allowed to become members of the tribe, except by the free consent of the tribe after its new organization, and unless the agent shall certify that such party is, through poverty or incapacity, unfit to continue in the exercise of the responsibilities of citizenship of the United States, and likely to become a public charge." 15 Stat. 514, 516.

Since the ratification of the Fourteenth Amendment, Congress has passed several acts for naturalizing Indians of certain tribes, which would have been superfluous if they were, or might become, without any action of the government, citizens of the United States.

By the act of July 15, 1870, ch. 296, § 10, for instance, it was provided that if at any time thereafter any of the Winnebago Indians in the State of Minnesota should desire to become citizens of the United States, they should make application to the District Court of the United States for the District of Minnesota, and in open court make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and should also make proof to the satisfaction of the court that they were sufficiently intelligent and prudent to control their affairs and interests, that they had adopted the habits of civilized life, and had for at least five years before been able to support themselves and their families; and there-

upon they should be declared by the court to be citizens of the United States, the declaration entered of record, and a certificate thereof given to the applicant; and the Secretary of the Interior, upon presentation of that certificate, might issue to them patents in fee simple, with power of alienation, of the lands already held by them in severalty, and might cause to be paid to them their proportion of the money and effects of the tribe held in trust under any treaty or law of the United States; and thereupon such persons should cease to be members of the tribe, and the lands so patented to them should be subject to levy, taxation, and sale, in like manner with the property of other citizens. 16 Stat. 361. By the act of March 3, 1873, ch. 332, § 3, similar provision was made for the naturalization of any adult members of the Miami tribe in Kansas, and of their minor children. 17 Stat. 632. And the act of March 3, 1865, ch. 127, before referred to, making corresponding provision for the naturalization of any of the chiefs, warriors, or heads of families of the Stockbridge Indians, is re-enacted in section 2312 of the Revised Statutes.

The act of January 25, 1871, ch. 38, for the relief of the Stockbridge and Munsee Indians in the State of Wisconsin, provided that "for the purpose of determining the persons who are members of said tribes and the future relation of each to the government of the United States," two rolls should be prepared under the direction of the Commissioner of Indian Affairs, signed by the sachem and councillors of the tribe, certified by the person selected by the Commissioner to superintend the same, and returned to the Commissioner; the one, to be denominated the citizen roll, of the names of all such persons of full age, and their families, "as signify their desire to separate their relations with said tribe, and to become citizens of the United States," and the other, to be denominated the Indian roll, of the names of all such "as desire to retain their tribal character and continue under the care and guardianship of the United States;" and that those rolls, so made and returned, should be held as a full surrender and relinquishment, on the part of all those of the first class, of all claims to be known or considered as members of the tribe, or to be interested

in any provision made or to be made by the United States for its benefit, " and they and their descendants shall thenceforth be admitted to all the rights and privileges of citizens of the United States." 16 Stat. 406.

The Pension Act exempts Indian claimants of pensions for service in the army or navy from the obligation to take the oath to support the Constitution of the United States. Act of March 3, 1873, ch. 234, § 28; 17 Stat. 574; Rev. Stat. § 4721.

The recent statutes concerning homesteads are quite inconsistent with the theory that Indians do or can make themselves independent citizens by living apart from their tribe. The act of March 3, 1875, ch. 131, § 15, allowed to " any Indian born in the United States, who is the head of a family, or who has arrived at the age of twenty-one years, and who has abandoned, or may hereafter abandon, his tribal relations," the benefit of the homestead acts, but only upon condition of his " making satisfactory proof of such abandonment, under rules to be prescribed by the Secretary of the Interior;" and further provided that his title in the homestead should be absolutely inalienable for five years from the date of the patent, and that he should be entitled to share in all annuities, tribal funds, lands and other property, as if had maintained his tribal relations. 18 Stat. 420. And the act of March 3, 1884, ch. 180, § 1, while it allows Indians "located on public lands" to " avail themselves of the homestead laws as fully and to the same extent as may now be done by citizens of the United States," provides that the form and the legal effect of the patent shall be that the United States does and will hold the land for twenty-five years in trust for the Indian making the entry, and his widow and heirs, and will then convey it in fee to him or them. 23 Stat. 96.

The national legislation has tended more and more towards the education and civilization of the Indians, and fitting them to be citizens. But the question whether any Indian tribes, or any members thereof, have become so far advanced in civilization, that they should be let out of the state of pupilage, and admitted to the privileges and responsibilities of citizenship, is a question to be decided by the nation whose wards they are

and whose citizens they seek to become, and not by each Indian for himself.

There is nothing in the statutes or decisions, referred to by counsel, to control the conclusion to which we have been brought by a consideration of the language of the Fourteenth Amendment, and of the condition of the Indians at the time of its proposal and ratification.

The act of July 27, 1868, ch. 249, declaring the right of expatriation to be a natural and inherent right of all people, and reciting that " in the recognition of this principle this government has freely received emigrants from all nations, and invested them with the rights of citizenship," while it affirms the right of every man to expatriate himself from one country, contains nothing to enable him to become a citizen of another, without being naturalized under its authority. 15 Stat. 223; Rev. Stat. § 1999.

The provision of the act of Congress of March 3, 1871, ch. 120, that " hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty," is coupled with a provision that the obligation of any treaty already lawfully made is not to be thereby invalidated or impaired; and its utmost possible effect is to require the Indian tribes to be dealt with for the future through the legislative and not through the treaty-making power. 16 Stat. 566; Rev. Stat. § 2079.

In the case of *United States* v. *Elm*, 23 Int. Rev. Rec. 419, decided by Judge Wallace in the District Court of the United States for the Northern District of New York, the Indian who was held to have a right to vote in 1876 was born in the State of New York, one of the remnants of a tribe which had ceased to exist as a tribe in that State; and by a statute of the State it had been enacted that any native Indian might purchase, take, hold and convey lands, and, whenever he should have become a freeholder to the value of one hundred dollars, should be liable to taxation, and to the civil jurisdiction of the courts, in the same manner and to the same extent as a citizen. N. Y. Stat. 1843, ch. 87. The condition of the tribe from which he

derived his origin, so far as any fragments of it remained within the State of New York, resembled the condition of those Indian nations of which Mr. Justice Johnson said in *Fletcher* v. *Peck*, 6 Cranch, 87, 146, that they "have totally extinguished their national fire, and submitted themselves to the laws of the States;" and which Mr. Justice McLean had in view, when he observed in *Worcester* v. *Georgia*, 6 Pet. 515, 580, that in some of the old States, "where small remnants of tribes remain, surrounded by white population, and who, by their reduced numbers, had lost the power of self-government, the laws of the State have been extended over them, for the protection of their persons and property." See also, as to the condition of Indians in Massachusetts, remnants of tribes never recognized by the treaties or legislative or executive acts of the United States as distinct political communities, *Danzell* v. *Webquish,* 108 Mass. 133 ; *Pells* v. *Webquish,* 129 Mass. 469 ; Mass. Stat. 1862, ch. 184 ; 1869, ch. 463.

The passages cited as favorable to the plaintiff from the opinions delivered in *Ex parte Kenyon*, 5 Dillon, 385, 390, in *Ex parte Reynolds*, 5 Dillon, 394, 397, and in *United States* v. *Crook*, 5 Dillon, 453, 464, were *obiter dicta*. The *Case of Reynolds* was an indictment in the Circuit Court of the United States for the Western District of Arkansas for a murder in the Indian country, of which that court had jurisdiction if either the accused or the dead man was not an Indian, and was decided by Judge Parker in favor of the jurisdiction, upon the ground that both were white men, and that, conceding the one to be an Indian by marriage, the other never was an Indian in any sense. 5 Dillon, 397, 404. Each of the other two cases was a writ of habeas corpus ; and any person, whether a citizen or not, unlawfully restrained of his liberty, is entitled to that writ. *Case of the Hottentot Venus*, 13 East, 195 ; *Case of Dos Santos*, 2 Brock. 493 ; *In re Kaine*, 14 How. 103. In *Kenyon's Case*, Judge Parker held that the court in which the prisoner had been convicted had no jurisdiction of the subject matter, because the place of the commission of the act was beyond the territorial limits of its jurisdiction, and, as was truly said "this alone would be conclusive of this case." 5 Dillon,

390. In *United States* v. *Crook*, the Ponca Indians were discharged by Judge Dundy because the military officers who held them were taking them to the Indian Territory by force and without any lawful authority; 5 Dillon, 468; and in the case at bar, as the record before us shows, that learned judge concurred in the judgment below for the defendant.

The law upon the question before us has been well stated by Judge Deady in the District Court of the United States for the District of Oregon. In giving judgment against the plaintiff in a case resembling the case at bar, he said: "Being born a member of 'an independent political community'—the Chinook —he was not born subject to the jurisdiction of the United States—not born in its allegiance." *McKay* v. *Campbell*, 2 Sawyer, 118, 134. And in a later case he said: "But an Indian cannot make himself a citizen of the United States without the consent and co-operation of the government. The fact that he has abandoned his nomadic life or tribal relations, and adopted the habits and manners of civilized people, may be a good reason why he should be made a citizen of the United States, but does not of itself make him one. To be a citizen of the United States is a political privilege which no one, not born to, can assume without its consent in some form. The Indians in Oregon, not being born subject to the jurisdiction of the United States, were not born citizens thereof, and I am not aware of any law or treaty by which any of them have been made so since." *United States* v. *Osborne*, 6 Sawyer, 406, 409.

Upon the question whether any action of a State can confer rights of citizenship on Indians of a tribe still recognized by the United States as retaining its tribal existence, we need not, and do not, express an opinion, because the State of Nebraska is not shown to have taken any action affecting the condition of this plaintiff. See *Chirac* v. *Chirac*, 2 Wheat. 259; *Fellows* v. *Blacksmith*, 19 How. 366; *United States* v. *Holliday*, 3 Wall. 407, 420; *United States* v. *Joseph*, 94 U. S. 614, 618.

The plaintiff, not being a citizen of the United States under the Fourteenth Amendment of the Constitution, has been deprived of no right secured by the Fifteenth Amendment, and cannot maintain this action. *Judgment affirmed.*

Mr. Justice Harlan, with whom concurred Mr. Justice Woods, dissenting.

Mr. Justice Woods and myself feel constrained to express our dissent from the interpretation which our brethren give to that clause of the Fourteenth Amendment which provides that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

The case, as presented by the record, is this: John Elk, the plaintiff in error, is a person of the Indian race. He was born within the territorial limits of the United States. His parents were, at the time of his birth, members of one of the Indian tribes in this country. More than a year, however, prior to his application to be registered as a voter in the city of Omaha, he had severed all relations with his tribe, and, as he alleges, fully and completely surrendered himself to the jurisdiction of the United States. Such surrender was, of course, involved in his act of becoming, as the demurrer to the petition admits that he did become, a *bona fide* resident of the State of Nebraska. When he applied in 1880 to be registered as a voter, he possessed, as is also admitted, the qualifications of age and residence in State, county, and ward, required for electors by the Constitution and laws of that State. It is likewise conceded that he was entitled to be so registered, if, at the time of his application, he was a citizen of the United States; for, by the Constitution and laws of Nebraska every citizen of the United States, having the necessary qualifications of age and residence in State, county, and ward, is entitled to vote. Whether he was such citizen is the single question presented by this writ of error.

It is said that the petition contains no averment that Elk was taxed in the State in which he resides, or had ever been treated by her as a citizen. It is evident that the court would not have held him to be a citizen of the United States, even if the petition had contained a direct averment that he was taxed; because its judgment, in legal effect, is, that, although born within the territorial limits of the United States, he could not, if at his birth a member of an Indian tribe, acquire national citizenship

by force of the Fourteenth Amendment, but only in pursuance of some statute or treaty providing for his naturalization. It would, therefore, seem unnecessary to inquire whether he was taxed at the time of his application to be registered as a voter; for, if the words "all persons born . . . in the United States and subject to the jurisdiction thereof," were not intended to embrace Indians born in tribal relations, but who subsequently became *bona fide* residents of the several States, then, manifestly, the legal status of such Indians is not altered by the fact that they are taxed in those States.

While denying that national citizenship, as conferred by that amendment, necessarily depends upon the inquiry whether the person claiming it is taxed in the State of his residence, or has property therein from which taxes may be derived, we submit that the petition does sufficiently show that the plaintiff is taxed, that is, belongs to the class which, by the laws of Nebraska, are subject to taxation. By the Constitution and laws of Nebraska all real and personal property, in that State, are subject to assessment and taxation. Every person of full age and sound mind, being a resident thereof, is required to list all of his personal property for taxation. Const. Neb., art. 9, § 1; Compiled Stat. of Neb., ch. 77, pp. 400-1. Of these provisions upon the subject of taxation this court will take judicial notice. Good pleading did not require that they should be set forth, at large, in the petition. Consequently, an averment that the plaintiff is a citizen and *bona fide* resident of Nebraska implies, in law, that he is subject to taxation, and is taxed, in that State. Further: The plaintiff has become so far incorporated with the mass of the people of Nebraska that, being, as the petition avers, a citizen and resident thereof, he constitutes a part of her militia. Comp. Stat. Neb., ch. 56. He may, being no longer a member of an Indian tribe, sue and be sued in her courts. And he is counted in every apportionment of representation in the legislature; the requirement of her Constitution being, that "the legislature shall apportion the Senators and Representatives according to the number of inhabitants, excluding Indians not taxed and soldiers and officers of the United States army." Const. Neb., art. 3, § 1.

At the adoption of the Constitution there were, in many of the States, Indians, not members of any tribe, who constituted a part of the people for whose benefit the State governments were established. This is apparent from that clause of article 1, section 3, which requires, in the apportionment of representatives and direct taxes among the several States "according to their respective numbers," the exclusion of "Indians not taxed." This implies that there were, at that time, in the United States, Indians who were taxed, that is, were subject to taxation, by the laws of the State of which they were residents. Indians not taxed were those who held tribal relations, and, therefore, were not subject to the authority of any State, and were subject only to the authority of the United States under the power conferred upon Congress in reference to Indian tribes in this country. The same provision is preserved in the Fourteenth Amendment; for, now, as at the adoption of the Constitution, Indians in the several States, who are taxed by their laws, are counted in establishing the basis of representation in Congress.

By the act of April 9, 1866, entitled "An Act to protect all persons in the United States in their civil rights, and furnish means for their vindication" (14 Stat. 27), it is provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." This, so far as we are aware, is the first general enactment making persons of the Indian race citizens of the United States. Numerous statutes and treaties previously provided for all the individual members of particular Indian tribes becoming, in certain contingencies, citizens of the United States. But the act of 1866 reached Indians not in tribal relations. Beyond question, by that act, national citizenship was conferred directly upon all persons in this country, of whatever race (excluding only "Indians not taxed"), who were born within the territorial limits of the United States, and were not subject to any foreign power. Surely every one must admit that an Indian, residing in one of the States, and subject to taxation there, became, by force alone of the act of 1866, a citizen of the United States, al-

though he may have been, when born, a member of a tribe. The exclusion of Indians not taxed evinced a purpose to include those subject to taxation in the State of their residence. Language could not express that purpose with more distinctness than does the act of 1866. Any doubt upon the subject, in respect to persons of the Indian race residing in the United States or Territories, and not members of a tribe, will be removed by an examination of the debates, in which many distinguished statesmen and lawyers participated in the Senate of the United States when the act of 1866 was under consideration.

In the bill as originally reported from the Judiciary Committee there were no words excluding "Indians not taxed" from the citizenship proposed to be granted. Attention being called to this fact, the friends of the measure disclaimed any purpose to make citizens of those who were in tribal relations with governments of their own. In order to meet that objection, while conforming to the wishes of those desiring to invest with citizenship all Indians permanently separated from their tribes, and who, by reason of their residence away from their tribes, constituted a part of the people under the jurisdiction of the United States, Mr. Trumbull, who reported the bill, modified it by inserting the words "excluding Indians not taxed." What was intended by that modification appears from the following language used by him in debate:

"Of course we cannot declare the wild Indians who do not recognize the government of the United States, who are not subject to our laws, with whom we make treaties, who have their own laws, who have their own regulations, whom we do not intend to interfere with or punish for the commission of crimes one upon the other, to be the subjects of the United States in the sense of being citizens. They must be excepted. The Constitution of the United States excludes them from the enumeration of the population of the United States when it says that Indians not taxed are to be excluded. It has occurred to me that, perhaps, the amendment would meet the views of all gentlemen, which used these constitutional words, and said that all persons born in the United States, excluding

Indians not taxed, and not subject to any foreign power, shall be deemed citizens of the United States." Cong. Globe, 1st Sess., 39th Congress, p. 527.

In replying to the objections urged by Mr. Hendricks to the bill even as amended, Senator Trumbull said :

"Does the Senator from Indiana want the wild roaming Indians, not taxed, not subject to our authority, to be citizens of the United States—persons that are not to be counted in our government ? If he does not, let him not object to this amendment that brings in *even* [only] *the Indian when he shall have cast off his wild habits, and submitted to the laws of organized society and become a citizen.*" Ibid. 528.

The entire debate shows, with singular clearness, indeed, with absolute certainty, that no Senator who participated in it, whether in favor of or in opposition to the measure, doubted that the bill, as passed, admitted, and was intended to admit, to national citizenship Indians who abandoned their tribal relations, and became residents of one of the States or Territories, within the full jurisdiction of the United States. It was so interpreted by President Johnson, who, in his veto message, said :

"By the first section of the bill all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States. This provision comprehends the Chinese of the Pacific States, *Indians subject to taxation,* the people called Gypsies, as well as the entire race designated as blacks, persons of color, negroes, mulattoes, and persons of African blood. Every individual of those races, born in the United States, is, by the bill, made a citizen of the United States."

It would seem manifest, from this brief review of the history of the act of 1866, that one purpose of that legislation was to confer national citizenship upon a part of the Indian race in this country—such of them, at least, as resided in one of the States or Territories, and were subject to taxation and other public burdens. And it is to be observed that, whoever was included within the terms of the grant, contained in that act, became citizens of the United States, without any record of

their names being made. The citizenship so conferred was made to depend wholly upon the existence of the facts which the statute declared to be a condition precedent to the grant taking effect.

At the same session of the Congress which passed the act of 1866, the Fourteenth Amendment was approved and submitted to the States for adoption. Those who sustained the former urged the adoption of the latter. An examination of the debates in Congress, pending the consideration of that amendment, will show that there was no purpose, on the part of those who framed it or of those who sustained it by their votes, to abandon the policy inaugurated by the act of 1866, of admitting to national citizenship such Indians as were separated from their tribes, and were residents of one of the States or of one of the Territories, outside of any reservation or territory set apart for the exclusive use and occupancy of Indian tribes.

Prior to the adoption of the Fourteenth Amendment numerous statutes were passed with reference to particular bodies of Indians, under which all the individual members of such bodies, upon the dissolution of their tribal relations or upon the division of their lands derived from the government, became or were entitled to become, citizens of the United States by force alone of the statute, without observing any of the forms required by the naturalization laws in the case of a foreigner becoming a citizen of the United States. Such was the statute of March 3, 1839, 5 Stat. 349, relating to the Brothertown Indians, in the then Territory of Wisconsin. Congress consented that the lands reserved for their use might be partitioned among the individuals composing that tribe. The act required the partition to be evidenced by a report and map to be filed with the Secretary of the Interior, by whom it should be transmitted to the President; whereupon, the act proceeded, " the said Brothertown Indians, and each and every of them, shall then be deemed to be, and, from that time forth, are hereby declared to be, citizens of the United States to all intents and purposes, and shall be entitled to all the rights, privileges, and immunities of such citizens," &c. Similar legislation was enacted with

reference to the Stockbridge Indians. 5 Stat. 646–7. Legislation of this character has an important bearing upon the present question, for it shows that, prior to the adoption of the Fourteenth Amendment it had often been the policy of Congress to admit persons of the Indian race to citizenship upon their ceasing to have tribal relations, and without the slightest reference to the fact that they were born in tribal relations. It shows also that the citizenship thus granted was not, in every instance, required to be evidenced by the record of a court. If it be said that the statutes, prior to 1866, providing for the admission of Indians to citizenship, required, in their execution, that a record be made of the names of those who thus acquired citizenship, our answer is, that it was entirely competent for Congress to dispense, as it did in the act of 1866, with any such record being made in a court or in any department of the government. And certainly it must be conceded that, except in cases of persons "naturalized in the United States" (which phrase refers only to those who are embraced by the naturalization laws and not to Indians), the Fourteenth Amendment does not require the citizenship granted by it to be evidenced by the record of any court, or of any department of the government. Such citizenship passes to the person, of whatever race, who is embraced by its provisions, leaving the fact of citizenship to be determined, when it shall become necessary to do so in the course of legal inquiry, in the same way that questions as to one's nativity, domicile, or residence are determined.

If it be also said that, since the adoption of the Fourteenth Amendment, Congress has enacted statutes providing for the citizenship of Indians, our answer is, that those statutes had reference to tribes, the members of which could not, while they continued in tribal relations, acquire the citizenship granted by the Amendment. Those statutes did not deal with individual Indians who had severed their tribal connections and were residents within the States of the Union, under the complete jurisdiction of the United States.

There is nothing in the history of the adoption of the Fourteenth Amendment which, in our opinion, justifies the conclu-

sion that only those Indians are included in its grant of national citizenship who were, at the time of their birth, subject to the complete jurisdiction of the United States. As already stated, according to the doctrines of the court, in this case—if we do not wholly misapprehend the effect of its decision—the plaintiff, if born while his parents were members of an Indian tribe, would not be embraced by the amendment, even had he been, *at the time it was adopted,* a permanent resident of one of the States, subject to taxation, and, in fact, paying property and personal taxes, to the full extent required of the white race in the same State.

When the Fourteenth Amendment was pending in the Senate of the United States, M.. Doolittle moved to insert after the words "subject to the jurisdiction thereof," the words "excluding Indians not taxed." His avowed object in so amending the measure was to exclude, beyond all question, from the proposed grant of citizenship, tribal Indians who—since they were, in a sense, subject to the jurisdiction of the United States—might be regarded as embraced in the grant. The proposition was opposed by Mr. Trumbull and other friends of the proposed constitutional amendment, upon the ground that the words "Indians not taxed" might be misconstrued, and, also, because those words were unnecessary, in that the phrase "subject to the jurisdiction thereof" embraced only those who were subject to the complete jurisdiction of the United States, which could not be properly said of Indians in tribal relations. But it was distinctly announced by the friends of the measure that they intended to include in the grant of national citizenship Indians who were within the jurisdiction of the States, and subject to their laws, because such Indians would be completely under the jurisdiction of the United States. Said Mr. Trumbull : "It is only those who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens ; and there can be no objection to the proposition that such persons should be citizens." Congress. Globe, Pt. 4, 1st. Sess.; 39th Cong., pp. 2890 to 2893. Alluding to the phrase " Indians not taxed," he remarked that the language of the proposed constitutional amendment was

better than that of the act of 1866 passed at the same session. He observed :

"There is a difficulty about the words 'Indians not taxed.' Perhaps one of the reasons why I think so is because of the persistency with which the Senator from Indiana himself insisted that the phrase 'Indians not taxed,' the very words which the Senator from Wisconsin wishes to insert here, would exclude everybody that did not pay a tax ; that that was the meaning of it ; we must take it literally. The Senator from Maryland did not agree to that nor did I, but, if the Senator from Indiana was right, it would receive a construction which, I am sure, the Senator from Wisconsin would not be for, for if these Indians come within our limits and within our jurisdiction and are civilized, he would just as soon make a citizen of a poor Indian as of the rich Indian." Ibid. 2894.

A careful examination of all that was said by Senators and Representatives, pending the consideration by Congress of the Fourteenth Amendment, justifies us in saying that every one who participated in the debates, whether for or against the amendment, believed that in the form in which it was approved by Congress it granted, and was intended to grant, national citizenship to every person of the Indian race in this country who was unconnected with any tribe, and who resided, in good faith, outside of Indian reservations and within one of the States or Territories of the Union. This fact is, we think, entitled to great weight in determining the meaning and scope of the amendment. *Lithographic Co.* v. *Sarony*, 111 U. S. 57.

In this connection we refer to an elaborate report made by Mr. Carpenter, to the Senate of the United States, in behalf of its judiciary committee, on the 14th of December, 1870. The report was made in obedience to an instruction to inquire as to the effect of the Fourteenth Amendment upon the treaties which the United States had with various Indian tribes of the country. The report says: "For these reasons your committee do not hesitate to say that the Indian tribes within the limits of the United States, and the individuals, members of such tribes, while they adhere to and form a part of the tribes to which they belong, are not, within the meaning of the

Fourteenth Amendment, 'subject to the jurisdiction' of the United States; and, therefore, that *such* Indians have not become citizens of the United States by virtue of that amendment; and, if your committee are correct in this conclusion, it follows that the treaties heretofore made between the United States and the Indian tribes are not annulled by that amendment." The report closes with this significant language: "It is pertinent to say, in concluding this report, that treaty relations can properly exist with Indian tribes or nations only, and that, *when the members of any Indian tribe are scattered, they are merged in the mass of our people, and become equally subject to the jurisdiction of the United States.*"

The question before us has been examined by a writer upon constitutional law whose views are entitled to great respect. Judge Cooley, referring to the definition of national citizenship as contained in the Fourteenth Amendment, says:

" By the express terms of the amendment, persons of foreign birth, who have never renounced the allegiance to which they were born, though they may have a residence in this country, more or less permanent, for business, instruction, or pleasure, are not citizens. Neither are the aboriginal inhabitants of the country citizens, so long as they preserve their tribal relations and recognize the headship of their chiefs, notwithstanding that, as against the action of our own people, they are under the protection of the laws, and may be said to owe a qualified allegiance to the government. When living within territory over which the laws, either State or Territorial, are extended, they are protected by, and, at the same time, held amenable to, those laws in all their intercourse with the body politic, and with the individuals composing it; but they are also, as a quasi-foreign people, regarded as being under the direction and tutelage of the general government, and subjected to peculiar regulations as dependent communities. They are 'subject to the jurisdiction' of the United States only in a much qualified sense; and it would be obviously inconsistent with the semi-independent character of such a tribe, and with the obedience they are expected to render to their tribal head, that they should be vested with the complete rights, or, on the other

hand, subjected to the full responsibilities of American citizens. It would not, for a moment, be contended that such was the effect of this amendment.

"When, however, the tribal relations are dissolved, when the headship of the chief or the authority of the tribe is no longer recognized, and the individual Indian, turning his back upon his former mode of life, makes himself a member of the civilized community, the case is wholly altered. He then no longer acknowledges a divided allegiance; he joins himself to the body politic; he gives evidence of his purpose to adopt the habits and customs of civilized life; and as his case is then within the terms of this amendment, it would seem that his right to protection, in person, property and privilege, must be as complete as the allegiance to the government to which he must then be held; as complete, in short, as that of any other native born inhabitant." 2 Story's Const., Cooley's Edi., § 1933, p. 654.

To the same effect are *Ex parte Kenyon*, 5 Dillon, 390; *Ex parte Reynolds*, Ib. 307; *United States* v. *Crook*, Ib. 454; *United States* v. *Elm*, Dist. Ct. U. S., Northern District of New York, 23 Int. Rev. Rec. 419.

It seems to us that the Fourteenth Amendment, in so far as it was intended to confer national citizenship upon persons of the Indian race, is robbed of its vital force by a construction which excludes from such citizenship those who, although born in tribal relations, are within the complete jurisdiction of the United States. There were, in some of our States and Territories at the time the amendment was submitted by Congress, many Indians who had finally left their tribes and come within the complete jurisdiction of the United States. They were as fully prepared for citizenship as were or are vast numbers of the white and colored races in the same localities. Is it conceivable that the statesmen who framed, the Congress which submitted, and the people who adopted that amendment, intended to confer citizenship, national and State, upon the entire population in this country of African descent (the larger part of which was shortly before held in slavery), and by the same constitutional provision to exclude from such citizenship Indians

who had never been in slavery, and who, by becoming *bona fide* residents of States and Territories within the complete jurisdiction of the United States, had evinced a purpose to abandon their former mode of life and become a part of the People of the United States? If this question be answered in the negative, as we think it must be, then we are justified in withholding our assent to the doctrine which excludes the plaintiff from the body of citizens of the United States, upon the ground that his parents were, when he was born, members of an Indian tribe. For, if he can be excluded upon any such ground, it must necessarily follow that the Fourteenth Amendment did not grant citizenship even to Indians who, although born in tribal relations, were, at its adoption, severed from their tribes, and subject to the complete jurisdiction, as well of the United States as of the State or Territory in which they resided.

Our brethren, it seems to us, construe the Fourteenth Amendment as if it read: " All persons *born subject* to the jurisdiction of, or naturalized in, the United States, are citizens of the United States and of the State in which they reside ; " whereas the amendment, as it is, implies in respect of persons born in this country, that they may claim the rights of national citizenship from and after the moment they become subject to the complete jurisdiction of the United States. This would not include the children, born in this country, of a foreign minister, for the reason that, under the fiction of extra-territoriality as recognized by international law, such minister, " though actually in a foreign country, is considered still to remain within the territory of his own State," and, consequently, he continues " subject to the laws of his own country, both with respect to his personal status, and his rights of property; and his children, though born in a foreign country, are considered as natives." Halleck's International Law, ch. 10, § 12. Nor was plaintiff born without the jurisdiction of the United States in the same sense that the subject of a foreign State, born within the territory of that State, may be said to have been born without the jurisdiction of our government. For according to the decision in *Cherokee*

*Nation* v. *Georgia*, 5 Pet. 17, the tribe, of which the parents of plaintiff were members, was not " a foreign State, in the sense of the Constitution," but a domestic dependent people, ' in a state of pupilage," and " so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connection with them, would be considered an invasion of our territory, and an act of hostility." They occupied territory, which the court in that case said, composed " a part of the United States," the title to which this nation asserted independent of their will. " In all our intercourse with foreign nations," said Chief Justice Marshall, in the same case, " in our commercial regulations, in any attempt at intercourse between Indians and foreign nations, they are considered as within the jurisdictional limits of the United States, subject to many of those restraints which are imposed upon our citizens. . . . They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their Great Father." And again, in *United States* v. *Rogers*, 4 How. 572, this court, speaking by Chief Justice Taney, said that it was " too firmly and clearly established to admit of dispute that the Indian tribes, residing within the territorial limits of the United States, are subject to their authority." *The Cherokee Tobacco*, 11 Wall. 616.

Born, therefore, in the territory under the dominion, and within the jurisdictional limits of the United States, plaintiff has acquired, as was his undoubted right, a residence in one of the States, with her consent, and is subject to taxation and to all other burdens imposed by her upon residents of every race. If he did not acquire national citizenship on abandoning his tribe and becoming, by residence in one of the States, subject to the complete jurisdiction of the United States, then the Fourteenth Amendment has wholly failed to accomplish, in respect of the Indian race, what, we think, was intended by it; and there is still in this country a despised and rejected class of persons, with no nationality whatever; who, born in our territory, owing no allegiance to any foreign power, and subject, as residents of the States, to all the burdens of govern-

ment, are yet not members of any political community nor entitled to any of the rights, privileges, or immunities of citizens of the United States.