(32 Misc. Rep. 584.)

## PEOPLE ex rel. JUARBE v. BOARD OF INSPECTORS OF TWENTY-FOURTH ELECTION DIST. OF TWENTY-FIFTH ASSEMBLY DIST. OF BOROUGH OF MANHATTAN.

(Supreme Court, Special Term, New York County. October, 1900.)

ELECTIONS—CITIZENSHIP—TREATY WITH SPAIN—CITIZEN OF PORTO RICO—RE-MOVAL TO THE UNITED STATES—RIGHT TO VOTE.

> Laws 1896, c. 909, § 34, subd. 1, requires that a person, in order to be entitled to vote at a state election, must be a male citizen of the United States. Const. U. S. art. 14, § 1, declares that all persons born or natural-ized in the United States, and subject to the jurisdiction thereof, are citi-zens of the United States. The treaty of peace with Spain (article 9) pro-vides that the civil rights and political status of the native inhabitants of the territory ceded by Spain to the United States shall be determined by congress. *Held*, that relator, who was a native-born citizen of Porto Rico, and resided there till September, 1899, when he moved to the United States, and who had never been naturalized, was not a citizen of the United States, within the meaning of the federal constitution, and hence not entitled to register as a voter.

Application by the people, on relation of Frank Juarbe, to compel the board of inspectors of the Twenty-Fourth election district of the Twenty-Fifth assembly district of the borough of Manhattan to regis-ter relator as a voter. Application denied.

Einstein & Townsend, for relator.

John Whalen, Corp. Counsel, and Arthur C. Butts, opposed.

FREEDMAN, J. This is an application for a mandamus compell-ing the board of inspectors of the Twenty-Fourth election district of the Twenty-Fifth assembly district in the borough of Manhattan to reconvene as a board of registration, and to add the name of the ap-plicant to the registry list as a qualified voter. Registry had been refused to him on the ground that he is not a qualified elector.

The constitution of the state of New York (article 11, § 1) defines who are qualified voters of the state, and imposes the duty upon the legislature (section 4) to enact laws for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage under the constitution, and for the registration of voters. Under the authority of this constitutional provision, chapter 909 of the Laws of 1896, entitled "An act in relation to elections, constituting chapter six of the General Laws," was passed. In subdivision 1 of section 34 of said act the qualifications required to be possessed by an elector are stated, and subdivision 2 of section 108 sets forth the oath which a person offering to vote, but whose right to vote is challenged, must take if he shall persist in his claim to vote. To be brief, it may be stated that the constitution and statute referred to, taken to-gether, require that a person, in order to be entitled to vote at a state election, must possess the following qualifications: (1) He must be a male citizen of the United States for more than 90 days, and of the age of 21 years; (2) an inhabitant of the state for 1 year next pre-ceding the election; (3) a resident of the county for 4 months; and

(4) a resident for 30 days of the election district where he offers to vote. Thus it will be seen that the right of citizenship and the right to vote are entirely separate rights, and that a citizen must comply with certain conditions before he can exercise the right of suffrage at a particular time and place. In this connection it may well be pointed out that women and infants may be citizens, and yet have no right to vote, for the right of suffrage is expressly restricted to male citizens. The affidavit of the relator alleges that he is informed and believes that he is a citizen of the United States; that his residence is, and since September, 1899, was, in the Twenty-Fourth election district of the Twenty-Fifth assembly district; that his age is 23 years; that he was born in the island of Porto Rico, where he resided from the time of his birth until September, 1899, and that after the treaty of peace between Spain and the United States he did not declare his allegiance to Spain, but that he adopted the nationality of the United States. If he thus became a citizen of the United States, he should have been registered, for he clearly possessed all the other prescribed qualifications. The board of inspectors determined that he is not a citizen of the United States, and the only question, therefore, is whether he became such a citizen in the manner claimed by him.

. Article 14 of the constitution of the United States determines who are citizens of the United States, as follows: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside." The moving papers affirmatively show that the relator was not born in the United States, and it therefore remains to be seen whether he became a naturalized citizen. The determination of this question involves considerably more than a mere consideration of the statutes of the United States relating to the naturalization of aliens. Beginning at the foundation, we find that in any other than a constitutional government the power to naturalize aliens rests with the autocrat or absolute ruler, whatever may be his title. In a constitutional government the power is delegated and vested in some department thereof. Sometimes the sovereign power or legislative will speaks directly, and grants naturalization to a particular individual by name, and sometimes a collective naturalization may be effected when a country or province becomes incorporated into or annexed to another country by conquest, cession, or free gift, and the inhabitants of the conquered or ceded country or province are declared to be citizens of the dominant country. Each nation reserves to itself the right to prescribe in what form and manner naturalization will be granted, and no man can acquire the rights of a naturalized citizen in any country without the sanction of the government thereof. Ordinarily, the sovereign power or legislative will contents itself with prescribing the terms upon which naturalization will be granted generally, and confides the duty of carrying out its will in detail to some department or tribunal invested with power for that purpose. The constitution of the United States confers the power upon congress to establish a uniform rule of naturalization. This

power has been exercised by the enactment of the statutes which may be found in the Revised Statutes of the United States (2d Ed.) under title 30, p. 378. These statutes were intended to cover all cases of individual applications, and under them the duty of transforming aliens into American citizens has been imposed upon certain courts. They also prescribe the conditions with which each applicant must comply before he can be naturalized. Except in the cases of minors, persons honorably discharged from the army of the United States, and some other exceptional cases not necessary to be enumerated, the most essential and usual condition is that the applicant must furnish proof of a previous declaration of intention to become a citi-zen of the United States, and of a residence of five years within the United States, and that he must take the oath of allegiance, and re-nounce all allegiance to any foreign sovereign. But it is not neces-sary to enlarge upon the provisions of these statutes, because the relator was not naturalized under any of them. His sole claim, as stated in his affidavit, is that he did not, after the ratification of the treaty of peace between Spain and the United States, or at any other time, declare his intention of retaining allegiance to the king of Spain, but that, on the contrary, he adopted the nationality of the United States, and served with the United States army of occupation in Porto Rico during the war with Spain in various capacities. But the validity of his claim in these respects does not depend solely upon the question whether he adopted the nationality of the United States. He must also show that the United States adopted him as a full-fledged citizen, and this could only have been the result of a col-lective naturalization of the Spanish subjects of Porto Rico.

The power to declare war is, by the constitution of the United States, vested in congress. By the exercise of this power war was declared against Spain, and, under the powers necessarily incidental to this war power, congress might have determined the civil rights and the political status of the inhabitants of Porto Rico in case no determination thereof was made by the provisions of the treaty of peace between Spain and the United States. But congress did not act. It therefore remains to be seen what the treaty of peace amounts to in the case at bar. Article 6, § 3, of the constitution of the United States provides as follows:

"(2) This constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

In Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643, the supreme court of the United States, defining the rights of persons individually or collectively to become citizens under the fourteenth amendment of the constitution of the United States, says:

"This section contemplates two sources of citizenship, and two sources only: birth and naturalization. The persons declared to be citizens are 'all persons born or naturalized in the United States, and subject to the jurisdiction there-of.' The evident meaning of these last words is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely sub-

ject to their political jurisdiction, and owing them direct and immediate allegiance. And the words relate to the time of birth in the one case, as they do to the time of naturalization in the other. Persons not thus subject to the jurisdiction of the United States at the time of birth cannot become so afterwards, except by being naturalized, either individually, as by proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired."

The United States had, therefore, the sovereign and undisputed right to provide in the treaty with Spain that all citizens of Porto Rico should at once become citizens of the United States. But it was not done.

Article 2 of the treaty of peace with Spain provides as follows:

"Spain cedes to the United States the island of Porto Rico and other islands now under the Spanish sovereignty in the West Indies, and the island of Guam in the Mariannes or Ladrones."

Article 9 of said treaty provides as follows:

"Spanish subjects, natives of the peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory, or may remove therefrom, retaining in either event all their rights of property, including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce, and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory, they may preserve their allegiance to the crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to reserve such allegiance; in default of which declaration they shall be held to have renounced it, and to have adopted the nationality of the territory in which they may reside. The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by congress."

The whole subject of collective naturalization was thus, by the express terms of the treaty, relegated to the congress of the United States. The treaty was signed December 10, 1898, and congress has not yet acted in the matter now under consideration. The right claimed by the relator depends upon express proof that the rights of full citizenship were conferred, and it cannot be upheld solely upon the broad claim that the constitution follows the flag, or the claim that in the United States there can be no subjects. If it were a case in which the relator was sought to be deprived of life, liberty, or property without due process of law, as required by the fundamental law of the United States, a different question would be presented. Inasmuch, therefore, as the case at bar rests upon a claim of privilege, and the relator has failed to show that the privilege was conferred by the United States, the conclusion is irresistible that he is not yet a citizen of the United States, within the true intent and meaning of that term, and that the board of inspectors committed no wrong in refusing to register him.

I have examined all the cases cited by the learned counsel for the relator, and I cannot find that any of them, when closely examined, is in conflict with the views above expressed. The only case requiring special notice is Hepburn v. Ellzey, 2 Cranch, 445, 2 L. Ed. 332. It was claimed that in that case Chief Justice Marshall distinctly recognized that inhabitants of a territory of the United States are citizens

of the United States. An examination of the case shows that no such broad doctrine was laid down or suggested. The case called for a construction of the act of congress defining the jurisdiction of the circuit court of the United States for the district of Virginia, and it was held that, inasmuch as the said act gave jurisdiction to the circuit courts in cases between a citizen of the state in which the suit is brought and a citizen of another state, a citizen of the District of Columbia, although a citizen of the United States, cannot maintain an action against a citizen of Virginia in the circuit court of the Virginia district, because a citizen of the District of Columbia is not a citizen of a state, within the meaning of the constitution. The recognition in this decision of a citizen of the District of Columbia as a citizen of the United States was entirely correct, because the territory comprised within the limits of the District of Columbia was ceded to the United States by the states of Virginia and Maryland, and the inhabitants thereof were citizens of the United States before they became citizens of the District of Columbia. The creation and cession of the District did not deprive them of their rights as citizens of the United States. They simply were separated from their respective states, but continued as citizens of the District to be citizens of the United States. The decision of this case, therefore, has no application to territories in general. In the case at bar the territory was acquired by means of the treaty, which, upon its ratification, became, in the language of the constitution of the United States, "the supreme law of the land." It did not make the inhabitants of the territory citizens of the United States, but, on the contrary, the determination of their civil rights and of their political status was in express terms reserved for future action by congress, and congress has not yet acted. By subdivision 2 of section 3 of article 4 of the United States constitution general power is conferred upon congress to make all needful rules and regulations respecting any territory belonging to the United States. The exercise of this power must be kept within constitutional limits, and may be reviewed by the courts in a proper case. But the case at bar is simply one of inaction, and no claim of privilege conferred can be based upon a neglect to act. I therefore repeat that the relator has failed to show that the privilege of being a full citizen of the United States was duly conferred upon him, so as to constitute him a qualified elector, within the true intent and meaning of the constitution and laws of the state of New York. The application for a mandamus must be denied, with costs.

Application denied, with costs.