# EX PARTE JOSÉ LÓPEZ GARCIA.

# APPLICATION FOR HABEAS CORPUS.

San Juan, Law, No. 1248.

CITIZENSHIP OF MINOR SON OF SPANIARD.
(Case of the Spanish Ante-Nati.)

**Treaty Construction—Treaty of Paris December 10, 1898.**

1. A treaty is a contract between states, made by the respective political departments of the government. On the political side the construction of the American Department of States is controlling; in judicial matters involving private rights it is persuasive, but not conclusive. Courts decide a question upon clear provisions of a treaty, rather than doubtful ones, if possible.

**Treaty of Paris—Circumstances of Execution.**

2. Treaties, like other contracts, must be construed in the light of the surrounding circumstances. In the case of the Treaty of Paris of December 10, 1898, the circumstances show the intention to be that Spain should withdraw entirely from the Western Hemisphere, and provisions as to citizenship in Porto Rico must be construed in that light.

**International Law—Equality of Nations.**

3. The basis of international law is absolute equality of nations, regardless of their size and their internal political organization. Internationally Porto Rico has from the Treaty of Paris been American. The jurisdiction of a nation within its own territory is exclusive, susceptible of no limitation not imposed by itself.

**International Law—Citizenship by Birth.**

4. What a state claims for itself it should concede under similar circumstances to other countries. A child born within the jurisdiction of a country is by the common law a citizen of that country. An American born abroad is subject to the jurisdiction of the foreign state until he comes to the United States.

Ex Parte Garcia.

Treaty of Paris—Natives of Peninsula.

5. By the Treaty of Paris a native of the Peninsula of Spain remains a Spaniard upon making declaration in the manner prescribed. A son of a Spaniard born before the treaty remains Spanish until Spain relinquishes sovereignty over him.

Citizenship—Common Law.

6. The principles of the common law are in a manner part of the Constitution. Allegiance and protection are mutual. Civil rights such as majority, succession, and intestacy are questions of status fixed by domicil. Political rights as to nationality depend upon the laws of the different countries.

International Law—Citizenship.

7. The country of the father is the country of his children until they arrive at the age of reason, when they may choose for themselves. Citizenship exists natus or datus, by birth or naturalization.

Naturalization—Conquest.

8. Naturalization is effected by conquest of territory recognized by treaty, but the policy of the United States has been to fix its terms in the treaty, not only recognizing private property, but allowing the election by the old citizens within a limited time to withdraw to their original country. This has been the policy in the Louisianian, Mexican, Alaskan, Spanish, and Danish acquisitions of the United States.

Treaty of Paris—Declaration of Spaniards.

9. The declaration made by Spaniards under the Treaty of Paris on forms prescribed by the United States War Department were to be filed before a municipal judge in Porto Rico.

Citizenship—Naturalization—Porto Rico Organic Act.

10. Where the citizenship terms of the treaty are not clear, resort may be had to the principles of naturalization by judicial proceedings under the laws of the United States. Subsequent legislation by Congress as to Porto Ricans does not in terms cover the subject of children of declarant Spaniards.

Minor Children of Spaniards—Citizenship during Minority.

11. Under decisions of the Supreme Court the ante-nati, that is to say, minor children born before the treaty, follow the condition of their fathers during their minority.

### Ex Parte Garcia.

Majority—What Act Necessary to Spanish Minors.

12. Within one year after attaining majority the Spanish antenati have the right of choosing their citizenship by a declaration on their own behalf before a court of record. Registration upon the privileged official books of the Spanish consulate is not the declaration required by the Treaty of Paris.

Majority—American Law Prevails.

13. This right of election to be exercised upon majority means majority under the American, and not under the Spanish, law. Consequently it must be exercised within one year after attaining the age of twenty-one years. Treaties do not protect bad faith.

Opinion filed July 30, 1918.

---

### Statement of Facts.

Petitioner, José López Garcia, filed a petition for writ of habeas corpus on June 25, 1918, under oath, alleging that he was born July 10, 1894, in the town of Cidra, Porto Rico, his father being Joaquin López Cortes, a native of the province of Alicante in the Spanish Peninsula. That after the proclamation of the treaty of peace between Spain and the United States the said father, under art. 9, made before the municipal court of Cidra, a court of record, a declaration of intention to preserve his Spanish allegiance, at which time petitioner was six years of age, a member of a family of five children, besides the mother and father. That this record has never been changed and that petitioner always considered himself a Spanish subject, and on June 15, 1917, renewed June 11, 1918, petitioner registered himself as a Spaniard in the Spanish consulate at San Juan, and always has intended to preserve the status of his father and desires to return to Spain for his permanent residence. That under the United States Conscription Act of 1917

Ex Parte Garcia.

he was included in the draft for the American Army in Porto Rico, having the number 3,335, whereupon, June 24, 1918, he claimed exemption before the local military board "because I am a resident alien (not German) who has not taken out first papers." That this claim was allowed, but subsequently the district board disallowed and revoked the exemption, and petitioner was ordered for military duty to Camp Las Casas, at San Juan. That he protested, renewing his claim for exemption, but that, "contrary to the right and will of petitioner, he was transported to said Camp Las Casas, and retained there as a member of the military forces of the United States, being deprived of his liberty and subject to the orders and control of the respondent, Colonel Orval P. Townshend, and his various officers who are in command of the military forces of the United States in the Island of Porto Rico." Whereupon he files this petition in habeas corpus.

In accordance with the practice in this court, in order to prevent taking the petitioner away from local, civil, or military authorities pending a trial for habeas corpus, the writ did not issue, but the matter was presented upon the right of the petitioner to apply for a writ. Colonel Townshend was represented by counsel appearing as an amici curiæ, and the cause was heard at length both upon oral and written argument June 29, 1918, and submitted for decision.

The facts show that there were 4,889 Spaniards, who, like petitioner's father, duly retained their Spanish citizenship in Porto Rico, that there have been 136 other sons of Spaniards now claiming exemption from military service, and that of these forty are duly registered at the Spanish consulate. There was no evidence of declaration or registration in any court in Porto Rico.

Ex Parte Garcia.

*Mr. F. H. Dexter* for petitioner.

*Messrs. Geo. S. Brengle* and *E. T. Fiddler* for Colonel Orval
P. Townshend.

HAMILTON, Judge, delivered the following opinion:

1. This is a *habeas corpus* brought to release petitioner from
the training camp where he is serving under the command of
Colonel O. P. Townshend, and depends upon the proper con-
struction of art. 9 of the treaty between Spain and the United
States signed at Paris December 10, 1898, and proclaimed
April 11, 1899.

The making of treaties is a function of the Executive in
which the Department of State is largely concerned, although
the ratification is by the Senate. The opinion of the Secretary
of State upon a treaty is therefore of great importance as show-
ing the understanding of the Department in the execution and
in the carrying out of a treaty. Treaty construction by the
political department, while not conclusive upon a court, is
nevertheless of much weight. Charlton v. Kelly, 229 U. S.
447, 468, 57 L. ed. 1274, 1283, 40 L.R.A.(N.S.) 397, 33 Sup.
Ct. Rep. 945. Particularly would this be true if the construc-
tion in question had been acquiesced in by the other contracting
country; for a treaty is a contract between nations. United
States v. Arredondo, 6 Pet. 691, 8 L. ed. 547. It is unques-
tionably true that courts have no right to amend a treaty by
inserting any clause, great or small; for this would be usurpa-
tion of power, and not exercise of judicial functions. It would
be making, and not construing, a treaty; nor can the court

supply a *casus omissus*. Justice Story, in the Amiable Isabella, 6 Wheat. 1, 71, 5 L. ed. 191, 208. So far as regards political questions, the construction of the political department is not only persuasive but binding upon the courts. In external or international matters there can be no uncertainty or division shown in national acts. Thus United States consistently claimed that the purchase of Louisiana from Napoleon extended to the Perdido river. Historically it would seem that this was a mistake, and that the French and Spanish claim that Louisiana at the time it was sold extended only to the Iberville and Lakes was correct. Cox, West Florida Controversy, *passim*. Nevertheless the Federal courts have as a matter of course adopted the view of the political department and held void all Spanish grants in the disputed territory between the Pearl and the Perdido after 1804. United States v. Lynde, 11 Wall. 632, 20 L. ed. 230; Pollard v. Hagan, 3 How. 212, 11 L. ed. 565.

In the question before us Secretary Hay on December 21, 1899, held that the rights of the sons of Spaniards were to be determined by Congress under art. 9 of the treaty, and on April 15, 1918, Secretary Lansing reaffirmed this construction. It is also claimed that the Spanish government acceded to this view in the time of Premier Sagasta, but, however this may be, such is not the view of the Spanish government at the present time.

Citizenship is rather a political than a property question, and might well come within the exclusive jurisdiction of the political department of the government. There might have been the further difficulty of enforcing an order of this court in habeas corpus upon the Military. But it would seem that the political departments desire the judicial determination of the citizenship of the applicant, and as the case comes before the

court in regular course it must be considered and determined upon judicial principles.

The rule that the nationality of the minor son follows that of the father is a general one, although it may not be so clear as that regarding the identity of husband and wife. "Undoubtedly by the law of nations an infant child partakes of his father's nationality and domicil." This has been repeatedly held by the American Department of State. Wharton, International Law Dig. §§ 183, 186. While it is true the literal wording of the Treaty of Paris may be interpreted to violate this rule, it would, if possible, be more satisfactory to rest the solution of the question at bar upon other principles than an interpretation which will wrest the nationality of a four-year old son away from the father, unquestionably alienigena. (Calvin's Case, 7 Coke, 16a, 77 Eng. Reprint, 395.) If there is any doubt as to the meaning of a treaty, it should be interpreted against the victor, in this case the United States. Taylor, International Pub. Law, § 591.

2. The present case depends upon the proper construction of a part of the Treaty of Paris between the United States and Spain; but treaties like other contracts must be construed in the light of the circumstances surrounding the contracting parties. These should probably be considered first.

The strained relations between the United States and Spain growing out of the long series of Cuban insurrections culminated in war, of which the principal features were the battles, land and naval, about Santiago de Cuba, and Manila in the Philippines. Spain found herself unable to bring supplies to her armies in the colonies and agreed to peace, negotiations being begun at Portsmouth and concluded at Paris December

Ex Parte Garcia.

10, 1898, and proclaimed after ratifications on April 11, 1899.
The treaty is in seventeen articles, which relate respectively to
the following subjects: (1) Cuba; (2) Porto Rico, West Indies,
and Guam; and (3) the Philippine Islands. Articles 4-7 con-
cern Spanish ships to the Philippines, repatriation of Spanish
soldiers, exchange of prisoners, and relinquishment of claims.
Articles 8 and 9 will receive subsequent attention. The re-
maining articles relate to religion, jurisdiction of courts, pend-
ing proceedings, copyrights, consular officers, vessels, obliga-
tions of Cuba, and time of ratification. Articles 8 and 9 relate
to property and Spanish subjects, art. 9 being as follows:
"Spanish subjects, natives of the Peninsula, residing in the
territory over which Spain by the present treaty relinquishes or
cedes her sovereignty, may remain in such territory or may
remove therefrom, retaining in either event all their rights of
property, including the right to sell or dispose of such property
or of its proceeds; and they shall also have the right to carry
on their industry, commerce and professions, being subject in
respect thereof to such laws as are applicable to other foreign-
ers. In case they remain in the territory they may preserve
their allegiance to the Crown of Spain by making, before a
court of record, within a year from the date of the exchange
of ratifications of this treaty, a declaration of their decision to
preserve such allegiance; in default of which declaration they
shall be held to have renounced it and to have adopted the na-
tionality of the territory in which they may reside. The civil
rights and political status of the native inhabitants of the ter-
ritories hereby ceded to the United States shall be determined
by the Congress." [30 Stat. at L. 1759].

The negotiations show that the intent of the contracting

parties was that Spain should surrender the sovereignty of all her foreign colonies, and in particular should devest herself of all interests in territories appurtenant to the Western Hemisphere. On the other hand, while the United States did not assume the sovereignty of Cuba, and in point of fact established an independent government there which still continues, it not only retained Cuba within its sphere of influence, but received the absolute cession and sovereignty of Porto Rico. With this the United States entered upon a new phase of its historical development. Previously there had been large accessions of territory from Spain as the result of war or treaty, but they had always been upon the mainland and adjacent to the original limits of the Union. With Porto Rico the United States acquired the most thickly populated island in the West Indies, which has become of peculiar importance on account of the subsequent acquisition of the Panama Zone and the construction of the Panama Canal. Historically it might be said that the result of the Spanish-American War was that Spain absolutely withdrew from the Western Hemisphere, and that the presence of Spaniards remaining in Porto Rico was intended to be. only temporary, like that of all other foreigners in any other portion of the United States. The political future of the Porto Ricans was left entirely to the discretion of the United States, which has by Act of March 2, 1917, made them American citizens, and thus united the Island irrevocably with. the nation. A proper construction of the treaty, therefore, would be in view of these historical facts. Re Ross, 140 U. S. 453, 475, 35 L. ed. 581, 589, 11 Sup. Ct. Rep. 897.

3. In taking up any question of international law the basis upon which to proceed is that of the absolute equality of na-

Ex. Parte Garcia.

tions. The nation, regardless of size, is the unit in international matters. Attempts have been made through international associations of different kinds to substitute the basis of class interest. The feasibility or the desirability of this is not a matter of law and need not be discussed; it is clear, however, that so far this effort has not prevailed, and that the basis of international relations is still the absolute equality of nations. The present World War is fought upon that basis and to secure the fuller recognition of that principle.

Each of these nations is absolutely supreme within its own borders so far as relates to outside nations. The nation may have such internal form of government as it seems proper. It may be an absolute empire, a constitutional monarchy, a Federal government with governmental powers divided between the nation and the federated states, or have any other form its people may deem best for its prosperity and development so far as it does not undertake to deny the same right and power to other nations. The United States, for instance, is, for international purposes, as fully a unit, fully a nation, as any other country on the globe, while, for internal purposes, national affairs are governed in accordance with a Federal Constitution, state affairs in accordance with state Constitutions, and the intermediate government known as territorial conforms to certain general rules fixed by the Federal government. One result is that territories are either considered as incorporated into the Union and on the way to ultimate statehood, or as having so much of the American constitutional rights as the Organic Act passed by Congress may declare. Of this second class is Porto Rico. These internal distinctions make no difference whatever so far as regards international relations. From

an international point of view Porto Rico is as thoroughly
American as the state of New York.

This general subject was discussed and decided by Chief
Justice Marshall "in the great case of the Exchange," which,
as the Chief Justice expresses, "explored an unbeaten path."
It was declared that "the jurisdiction of the nation, within
its own territory, is necessarily exclusive and absolute. It is
susceptible of no limitation, not imposed by itself. Any re-
striction upon it, deriving validity from an external source,
would imply a dimunition of its sovereignty, to the extent
of the restriction, and an investment of that sovereignty, to
the same extent, in that power which could impose such re-
striction.- All exceptions, therefore, to the full and complete
power of a nation, within its own territories, must be traced
up to the consent of the nation itself. They can flow from no
other legitimate source. This consent may be either express or
implied. In the latter case, it is less determinate, exposed
more to the uncertainties of construction; but, if understood,
not less obligatory." The Exchange v. M'Fadon, 7 Cranch,
116, 135, 136, 3 L. ed. 287, 293.

Similarly in the later case of United States v. Wong Kim
Ark it is held incontrovertible that the jurisdiction of every
nation within its own territory is exclusive and absolute, and is
susceptible of no limitation not imposed by itself. 169 U. S.
686, 42 L. ed. 904, 18 Sup. Ct. Rep. 456.

The principles of American citizenship were made clearer
between the dates of these two great cases by the adoption of
the 14th Amendment to the Constitution, which declares that
"all persons born or naturalized in the United States and sub-
ject to the jurisdiction thereof are citizens of the United

States." The basis of natural citizenship, therefore, is birth (1) within the limits of the United States, and (2) under the jurisdiction or sovereignty of the Union. This would exclude, and is meant to exclude, the children of ambassadors, enemies, or other extraterritorial persons, but would include children even of persons who could not themselves become citizens by naturalization, like a Chinese in the case of Wong Kim Ark, supra. To this must be added a second kind of citizenship, that arising from naturalization. The privileges and results are practically identical.

4. A corollary from the equality of states is that what one nation claims for itself within its boundaries, it must concede as belonging to another nation within the boundaries of such foreign country. United States v. Wong Kim Ark, supra, 672. Birth and allegiance go together. United States v. Rhodes, 1 Abb. (U. S.) 28–40, Fed. Cas. No. 16,151. Subject and citizen are convertible terms; the former being applied to kingdoms and the latter to republics. 2 Kent, Com. 258; The Pizarro, 2 Wheat. 227, 4 L. ed. 226. It follows that a child born abroad of American parents was not American, at least so long as he remained abroad, and it required an Act of Congress of February 10, 1855, to change this, declaring that "the rights of citizens shall not descend to persons whose father never resided in the United States." 10 Stat. at L. 604, chap. 71. Citizenship was nevertheless extended to foreign-born children of American parents by Act of Congress, but they were expressly described as born out of the limits and jurisdiction of the United States. Rev. Stat. §§ 1993, 2172, Comp. Stat. 1916, §§ 3947, 4367. This exceptional legislation changes the common-law principle that a person born in a

strange country under the obedience of a strange prince or country is an alien. Co. Litt. 128b. And it is uniformly considered that this legislation applies only so far as concerns such person when he comes to the United States, or his rights within the United States, and was not designed to affect his territorial allegiance to the state of his birth.

5. It will be observed that these principles apply to a child born within the limits and under the jurisdiction of a given country. The petitioner was born within the limits and under the jurisdiction of Spain, and must be considered as being and continuing a Spaniard until by some means Spain has relinquished her sovereignty over· him. By the Treaty of Paris, article 9, his father, being a native of the Peninsula, could remain in the ceded territory of Porto Rico or remove therefrom in the former case preserving his "allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their [his] decision to preserve such allegiance; in default of which declaration they [he] shall be held to have renounced it and to have adopted the nationality of the territory in which they [he] may reside." It will be seen that this provision is not limited to Porto Rico, but covers also Cuba and the Philippines. It does not in express terms cover the wife or children of such declarant, and the case at bar is one of such child.

6. So far as a case is not governed by special provisions of a treaty, all acts creating rights within the territory of the United States are governed by the common law, modified, it may be, by statute. The common law is, so to speak, a part of the Constitution. Minor v. Happersett, 21 Wall. 162, 22 L.

Ex Parte Garcia.

ed. 627; Moore v. United States, 91 U. S. 270, 274, 23 L. ed. 346, 347. This does not mean, however, that there is a national common law, except perhaps so far as the principles of the common law may be said to be general throughout the United States. Smith v. Alabama, 124 U. S. 465, 478, 31 L. ed. 508, 512, 1 Inters. Com. Rep. 804, 8 Sup. Ct. Rep. 564; Wheaton v. Peters, 8 Pet. 591, 658, 8 L. ed. 1055, 1079. The common law of England in regard to citizenship may be said to go back to a statute of 17th Edward III. A. D. 1343, and later statutes on the same subject, which determine that children of Englishmen born in parts beyond the seas out of the ligeance of England may inherit in England. United States v. Wong Kim Ark, 169 U. S. 668, 42 L. ed. 897, 18 Sup. Ct. Rep. 456. This was perhaps declaratory of the common law and in America the particular point is covered by Revised Statutes, § 1993, Comp. Stat. 1916, § 3947, a law dating from 1802, which declares that rights of citizenship shall not descend to children whose fathers never resided in the United States. The common-law principle is that all persons born within the King's allegiance and subject to his protection are Englishmen, that is to say, allegiance and protection are mutual. Calvin's case, sometimes called the case of the Post Nati, 7 Coke, 1, 4b, 18a, 18b, 77 Eng. Reprint, 377, A. D. 1608. Co. Litt. 8a, 128b. 13 Ops. Atty. Gen. 89. Civil rights, that is to say, as to majority, marriage, succession, and intestacy, depend upon status as fixed by domicil, but political rights fixing one's country and nationality depend upon different laws in different countries. Udny v. Udny, L. R. 1 H. L. Sc. App. Cas. 441, 9 Eng. Rul. Cas. 782. That is to say, naturalization and allegiance is a distinct question from that of domicil.

X. Porto Rico.—34.

### Ex Parte Garcia.

By the Code Napoleon, art. 3, and allied systems, citizenship depends upon paternity as well as the place of birth Spanish Civ. Code art. 17. By the common law it depends upon the place of birth, and this controls in the United States. United States v. Wong Kim Ark, supra. Valery in 31 Harvard L. Rev. 984. Germany under her Delbruck Law of 1913 claims anyone born a German no matter where naturalized, but this is not American. Expatriation is a fundamental American principle.

7. Nevertheless, while citizenship is to be determined by each country for itself, there is international usage on the subject. Vattel declares that "natives are those who are born in a country of parents who are citizens. Society not being able to sustain and perpetuate itself except through the children of citizens, these children naturally follow the condition of their fathers and enter into all their rights. Society is supposed to will this, because it owes to it its own preservation and rightfully presumes that each citizen, upon entering into society, reserves to his children the right of also being members. La patrie des peres est donc celle des enfans; and they become true citizens by their simple tacit consent. We shall see that when they arrive at the age of reason they can renounce their right and that which they owe to the society in which they were born. I say that to be part of a country one must be born of a citizen father; for if you are born of a stranger, the country will be only the place of your birth, without being your country." Vattel, Le Droit des Gens, Bk. 1, chap. 19, § 212.

There can be but two kinds of citizenship,—birth or naturalization,—as is also recognized by Vattel, natus or datus as quaintly expressed by Coke in Calvin's Case. Citizenship by

Ex Parte Garcia.

birth is of persons born in the United States subject to the jurisdiction thereof. Slaughter-House Cases, 16 Wall. 36, 73, 21 L. ed. 394, 407. Naturalization when accomplished in accordance with the laws on that subject also makes one completely subject to the political jurisdiction of the United States. Elk v. Wilkins, 112 U. S. 94, 101, 28 L. ed. 643, 645.

Petitioner, not being an American natus, can only become such datus, by some kind of naturalization. If not, he is, under art. 5 of the Treaty of 1903 with Spain, "exempt from all compulsory military service." 33 Stat. at L. 2105, 2108.

8. Naturalization is generally spoken of in connection with the laws authorizing aliens to become citizens through certain proceedings in court, but it also covers collective naturalization by force of a treaty under which foreign territory is acquired. Elk v. Wilkins, supra. War, being the ultima ratio regum, has its own rules and cannot be said to be subject to laws of any kind except the will of the victor. From the beginning of history the conquering nation has imposed what terms it will upon the conquered, and frequently one result has been the acquisition of territory and the people inhabiting it. From this decision there is no appeal except another war, but it cannot be said that the precedents have made binding law. The United States perhaps introduced a new precedent in the Treaty of Guadalupe Hidalgo in February, 1848, whereby the Union, although the conqueror, taking land which it claimed against the will of Mexico, nevertheless paid the conquered country money for it. The same course was followed in the Treaty of Paris when the United States acquired the Philippines and Porto Rico from Spain, and in fact it may be said to be the American procedure; for similar purchases without

Ex Parte Garcia.

war have been made from Russia in 1867 and Denmark in 1917, and had been made with Spain in the purchase of Florida in 1819. Somewhat similar also were the annexations of Texas and Hawaii.

It is quite true that such methods have not been general even in modern times, and a strikingly Teutonic method was the Treaty of Frankfort in 1871 by which Prussia, improving upon her past acts of a similar character with other countries, tore Alsace and Lorraine from France, besides exacting a crushing war indemnity. Not only has America introduced a new practice in regard to paying for land acquired, but it has disdained forcing the inhabitants of the acquired territory to become subjects. The practice on this subject in Europe, beginning in the 17th century, was to permit those of the old nationality to retire from the annexed territories within a certain limited time. Even Prussia permitted this as to Denmark in 1864 and France in 1871. After the period fixed there could be no question as to nationality. America has of course permitted this, but it has in the Treaty of Paris, acting for itself and for Cuba also, allowed the native Spaniards to remain in the annexed territory and still retain their own citizenship, provided they registered to that effect within the period of one year. Treaty of Paris, art. 9; Treaty with Denmark, art. 6, 39 Stat. at L. 1712.

The general principle on acquisition of foreign territory is declared by the Supreme Court in Boyd v. Nebraska, 143 U. S. 135, 162, 36 L. ed. 103, 109, 12 Sup. Ct. Rep. 375, to be as follows: "Manifestly the nationality of the inhabitants of territory acquired by conquest or cession becomes that of the government under whose dominion they pass, subject to the

right of election on their part to retain their former nationality
by removal or otherwise, as may be provided."

The provisions spoken of have now grown into a settled sys-
tem, and can be better understood by noting the steps of that
growth.

The earliest treaty on the. point was that of the acquisition
of Louisiana from France. Art. 3 of this Treaty of April 30,
1803, however, provided for the incorporation of the inhabit-
ants into the Union, and did not contemplate their remaining
Frenchmen or Spaniards as the case may be. 8 Stat. at L.
202. Almost the same phraseology was followed upon the ac-
quisition of Florida from Spain by the Treaty of February
22, 1819, article 6 providing for similar incorporation into the
Union. 8 Stat. at L. 252, 256.

It was not until the Treaty of Guadalupe Hidalgo upon the
termination of the war with Mexico that the other system, that
is, permitting the old inhabitants to elect their citizenship, was
introduced, a liberality of treatment quite in keeping with the
provision for payment for the lands ceded. Thus art. 8 of the
treaty provides that Mexicans within the ceded territories "shall
be free to continue where they now reside or to remove at any
time to the Mexican Republic." 9 Stat. at· L. 929; Malloy,
Treaties, Conventions, of United States, 1111. "Those who
shall prefer to remain in the said territories may either retain
the title and rights of Mexican citizens or acquire those of citi-
zens of the United States. But they shall be under the obliga-
tion to make their election within one year from the date of
the exchange of ratifications of this treaty; and those who shall
remain in the said territories after the expiration of that year
without having declared their intention to retain the character

of Mexicans shall be considered to have elected to become citizens of the United States." The right of election, therefore, is conferred upon Mexicans within the ceded territory provided they "declare their intention to retain the character of Mexicans," but it is not specified how this declaration shall be made, nor does there seem to be a reported decision of any court upon this subject. Being in the nature of naturalization, however, the declaration would probably be held analogous to that required for what are ordinarily called the first papers of citizenship, really, a declaration filed in a court of record. Rev. Stat. § 2165. If one born in Texas before the revolution was taken to Mexico, and remained there after majority, she remained Mexican. Jones v. McMasters, 20 How. 20, 15 L. ed. 810.

The next treaty was that of March 30, 1867, with Russia for the purchase of Alaska. Article 3 provided that "the inhabitants of the ceded territory, according to their choice reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory they . . . shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States." 15 Stat. at L. 539, 542. No provision is herein made for inhabitants to remain Russians except by emigration within three years, and the same reason existed as in the case of Louisiana, the treaty providing for the early incorporation of these people as American citizens.

The only other convention before the Treaty of Paris was the joint resolution of July 7, 1898 (30 Stat. at L. 750), annexing the Hawaiian Islands, and as the whole of the insular state was annexed there was and could be no provision for emigration or for any citizenship except the American.

Ex Parte Garcia.

In none of these cases is any direct provision made as to the nationality of the wife and minor children of the inhabitants of acquired territory. As to the wife no question has ever been made that she necessarily follows the nationality of the husband. Mackenzie v. Hare, 239 U. S. 299, 60 L. ed. 297, 36 Sup. Ct. Rep. 106, Ann. Cas. 1916E, 645. The family relation could not exist if the two members of it lived under different laws and customs. An alien woman whose husband is naturalized becomes an American citizen. 2 Cyc. 118. And the same is true of the minor child of an alien dwelling within the United States at the time of naturalization. Campbell v. Gordon, 6 Cranch, 176, 3 L. ed. 190. An American woman marrying a foreigner takes his nationality. 34 Stat. at L. 1228, chap. 2534, Comp. Stat. 1916, § 3958; McKenzie v. Hare, supra. Such was the state of the law when the Treaty of Paris was signed December 10, 1898, and ratified on April 11 following. U. S. Rev. Stat. §§ 2168–2172, Comp. Stat. 1916, §§ 4358, 4360, 4362, 4367.

Before discussing the case under that treaty it may be noted that the treaty with Denmark in 1917 for the cession of the Danish West Indies expressly provided as to election of citizenship in general that "for children under eighteen years the said declaration may be made by their parents or guardians." It would be strange to find this policy as to Danes and nonexistent as to Spaniards in the next island but a few miles away.

9. After the Treaty of Paris, general order No. 132, dated August 31, 1899, was prescribed by the War Department for the purpose of carrying out the treaty in question, and it was under this that the applicant's father made the registration set

*Ex Parte Garcia.*

out in the petition. The general order provided, and the registration covered:

"II. For the purpose of permanent record and the protection of the parties concerned, a document will be prepared in duplicate in each case by the municipal judge setting forth the following facts: (a) The name and surname of the interested party, his or her age, nationality (specifying the province), civil status and profession, trade and occupation. (b) Names of wife and children, should there be any, and the names of the applicant's parents. (c) The date on which the declaration is made and signed. This document shall be subscribed by the applicant and witnessed by the signature of the municipal judge and the secretary of his court.

"III. Unmarried women (natives of the Peninsula), of legal age, will make declaration in the same manner as men."

Under this 4,889 Spaniards registered.

The question in the case at bar is as to the legal effect of this parental registration, which did not pursue the words of the treaty and call generally for a court of record, but provided for a document before the municipal judge. The municipal court was the lowest court of the judicial system of Porto Rico. No express reservation was made either in the treaty or in the military order for a declaration on behalf of a wife or a minor child of the Spaniards so reserving his own citizenship. The only analogous provision is that numbered 4 of the military order, to wit: "Guardians may make declarations for their wards (such children being natives of the Peninsula), but any such ward who attains the age of twenty-one years before April 11, 1900, may renounce such act as he or she becomes of legal age, by appearing before a municipal judge and making dec-

laration of such renunciation, and such renunciation will be recorded, indorsed, and returned in the same manner as hereinafter prescribed for declarations."

By its terms, however, this is limited to wards natives of the Peninsula, and does not cover minors of Porto Rico at the time of the treaty.

10. The old idea of the state was that it not only embraced all citizens, but that they existed for the benefit of the state. At least since the American and French Revolutions it has been the basis of sound political thought that the converse is true, that the state is for the benefit of the citizens, and in fact is controlled by them. It is not to be supposed that the United States holds a different theory from this in regard to the new citizens whom it acquires by treaty or desires to force the citizenship of anyone. In the Treaty of Paris it is clear that natives of the Peninsula may even remain in Porto Rico without becoming citizens at all, provided they merely made a formal registration for purposes of identification. Even in regard to Americans at large, the American policy is clear in not only recognizing, but in enforcing, the right of expatriation, that is to say, the right of the individual to choose his own country. U. S. Rev. Stat. § 1999, Comp. Stat. § 3955, the law dating from A. D. 1868. The right which the United States claim and enforce for its own citizens it cannot deny to the citizens of other countries. On principle the minor must be held under the Treaty of Paris to have some choice as to his citizenship. It is undoubtedly true that the father cannot decide the ultimate citizenship of his child, but no reason appears why he cannot in this regard act for his child as he does in every other respect, that is to say, make a provisional choice which the child may

ratify or disaffirm upon coming of age; for "whether any act of himself or of his parents during his minority could have the same effect is at least doubtful." United States v. Wong Kim Ark, 169 U. S. 704, 42 L. ed. 910, 18 Sup. Ct. Rep. 456. It is true that the treaty does not expressly authorize the father to elect for the son, but this is not conclusive. We are dealing with a case of naturalization, and if that document itself is not clear, the American theory and practice in regard to individual naturalization may be resorted to for further light.

The subject of naturalization is an old one in American law, for its principal provisions go back to the Act of 1802 as amended several times afterwards. The machinery has been altered, but not the principle upon which naturalization is based. To this day it is provided that no alien enemy can be admitted as a citizen, however eligible otherwise. (Rev. Stat. § 2171, Comp. Stat. 1916, § 4362). "The children of persons who have been duly naturalized under any law of the United States . . . being under age of twenty-one years at the time of the naturalization of their parents, shall, if dwelling in the United States, be considered as citizens thereof." [§ 2172]. Under this thousands of persons have become citizens of the United States, and it may be said to be the settled policy of the United States, as it is of the world at large as shown by Vattel, supra, that children follow the nationality of the father. Campbell v. Gordon, 6 Cranch, 176, 3 L. ed. 190. No reason appears why this policy which is expressly provided for naturalization in court proceedings should not apply to naturalization by treaty where the words of the treaty itself are silent and its general scope is not inconsistent with such interpretation. The treaty has to be interpreted one way or the other, and it would

seem logical to interpret it in accordance with the general policy of the United States on the subject of naturalization; that is, that the father's election provisionally elects the nationality also of the minor child.

There is no question that the legislation of Congress may override a treaty (Cherokee Tobacco (Boudinot v. United States) 11 Wall. 616, 20 L. ed. 227; Thomas v. Gay, 169 U. S. 264, 42 L. ed. 740, 18 Sup. Ct. Rep. 340), and it is important to see what has been congressional action in regard to citizenship in Porto Rico. The act for a civil government in Porto Rico approved April 12, 1900, generally called the Foraker Act, provides in § 7 a body politic under the name of the People of Porto Rico made up, besides other Americans, of "all inhabitants continuing to reside therein who were Spanish subjects on the 11th day of April, 1899, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United States, except such as shall have elected to preserve their allegiance to the Crown of Spain on or before the 11th day of April, 1900, in accordance with the provisions of the treaty of peace between the United States and Spain entered into on the 11th day of April, 1899. . . ." [31 Stat. at L. 79, chap. 191, Comp. Stat. 1916, § 3753].

This makes citizens of those who were Spanish subjects upon the date of the treaty and children born subsequent thereto, excepting those electing to preserve their Spanish allegiance. This cannot be said to clear up the point except negatively that it does not make citizens of Spanish children born prior to the treaty.

The recent Organic Act for Porto Rico of March 2, 1917,

commonly called the Jones Act, in § 5 goes no further, for it expressly makes American citizens out of those who were made Porto Rican citizens by the Foraker Act. It also adds those who have previously been nonresident and allows Porto Ricans to disclaim American citizenship, but these provisions are beside the question. It also provides, however, for any person who was born in Porto Rico of an alien parent and is permanently residing in that Island, permitting him when he comes of full age to make a sworn declaration of allegiance to the United States. Under this provision the Federal court in Porto Rico has admitted to American citizenship not only the sons of many Frenchmen and other foreign citizens who were clearly aliens, but also the sons and daughters of not a few Spaniards who had preserved their Spanish nationality by registering before the Spanish consulate. So far as this affects the question at all, it would favor the construction of the treaty to the effect that such registration of the father carried with it the retention of citizenship for his minor children as well; for if these were already Americans there would be no occasion to have them made American citizens under § 5. This question, however, was always presented ex parte. The United States government was not represented in such proceedings and was not bound by them.

This Jones Act does not strictly apply to the case at bar because passed after the rights of the petitioner had accrued, whatever may be its application to later cases. The treaty provides that "the civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." Unless the petitioner was excepted by his minority—which will be later determined

Ex Parte Garcia.

—he comes under this provision. In such case when the Jones Act permits the child of an alien, born in Porto Rico and permanently residing there, which is precisely the condition of petitioner, to take the oath of allegiance, it is naturalizing him and as an alien having some peculiar hold upon the United States. If he does not take the oath he remains such an alien still. It is true that the act was not passed soon enough for the petitioner to take advantage of it, for he was then over twenty-one years of age; but the act seems to carry an admission that persons in his condition if two years younger were aliens. Could he be any less an alien because he had been one two years longer? The only way to escape this conclusion is to suppose that Congress in § 5 was merely passing an act of grace to all aliens, temporary in its nature, that its terms imported no declaration of policy as to past cases, and were not intended to carry out the treaty provision as to determining the status of persons native to Porto Rico.

American legislation is not systematic like the French and Spanish, and, while it means what it says, it does not necessarily negative what it does not say. Negative inferences are unsafe. In this state of doubt it is better to consider the question upon principle without relying certainly upon § 5 or the ex parte admissions to citizenship under it.

11. What has been the nationality of the petitioner up to the time of his registering at the Spanish consulate? He was born a Spaniard and was a minor at the time of the Treaty of Paris. Is he to be considered after that time as a Spaniard, an American, or was his nationality undecided until he decided it at majority?

It would seem that this has been settled in the case of Inglis

Ex Parte Garcia.

v. Sailor's Snug Harbor, 3 Pet. 99, 7 L. ed. 617, decided by the Supreme Court of the United States in 1830. There Jones Inglis was born in New York city either before the outbreak of the Revolution or while the city was occupied by the British forces. In either case his father had been and he consequently was an Englishman. Before the city fell into American hands his father returned to England and lived and died under the English flag. Jones never came back to America and the question of his nationality had to be determined for the purposes of the case then before the court. The Treaty of 1783 says nothing as to citizenship (8 Stat. at L. 80), and, as people on both sides were originally British, nationality for the future depends upon their adhering to the King or to the colonies during the war (Shanks v. Dupont, 3 Pet. 242, 7 L. ed. 666). It was held per Justice Johnson that Jones Inglis was born an Englishman, this being founded upon his birth within the British dominions, and that the father had the right and the duty of making a provisional election for the son. On the one hand, the British doctrine is that the American Ante-Nati by remaining in America after the treaty of peace lost their character of British subjects, and, on the other, the American doctrine is that by withdrawing from this country and adhering to the British government they lost, or perhaps more properly speaking, never acquired, the character of American citizens. S. C. page 122. Inglis while a child was incapable of making an election for himself, but after the lapse of time was taken to have adopted and ratified the choice made for him by his father and still to retain the character of a British subject and so never to have become an American citizen. This conclusion was based upon the fact that he was taken from the country by

his father before the treaty of peace and continued long after coming of age to reside within the British dominions without signifying any dissent to the election made for him, and this ratification as to all rights must relate back and have the same effect and operation as if the election had been made by himself at that time. Id. page 123. A good deal of the case is taken up in determining whether the father was or was not an American citizen, for his citizenship determined that of his son. In the case at bar there is no such difficulty, as it is conceded the father of the petitioner properly retained his Spanish citizenship by conforming to the provisions of the Treaty of Paris. In the Inglis Case the election was made by withdrawing from the United States, while in the case at bar this was not done and was not required to be done by the very terms of the treaty. During the intervening time up to majority, therefore, it must be held that the petitioner was a Spaniard like his father. Such was the decision of this court, per Judge Rodey, in Martinez de Hernandez v. Casahas, as to election for a minor child. It is not necessary for the purposes of the case at bar to discuss the matter of election for a niece, also covered by the Martinez Case. 2 Porto Rico Fed. Rep. 519.

12. There remains to be considered, however, the important point of what duty is incumbent upon the minor himself when he reaches his majority. Under the municipal law the act of the minor during minority, or the act of anyone for him during minority, holds unless it is disaffirmed by the minor at majority; but there cannot be said to be any rule of international law or of public law to this effect on the subject of citizenship. The Treaty of Paris seems to contemplate that all Spaniards who do not elect otherwise in a certain way become American

citizens, and the Inglis Case provides that, while the father can act provisionally for the son, its effects do not outlast minority, and the son must elect for himself upon attaining majority. Statutory extension of time in favor of one under disability does not affect the right, but only the period. 27 Am. & Eng. Enc. Law, 856. Unless required by treaty, no formal act is needed, but when choice is made what is called double allegiance is ended and the election is final. 3 Moore, International Law Dig. 545.

The treaty requires Spaniards having the right to act to make "before a court of record within a year . . . a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it." It would be too strict a construction to require the father to make a different declaration from that which was prescribed by the military authorities in control of the Island; and while the wording of it may be construed as being for identification so far as children are concerned, no other method was provided as to children born here, and there is no reason to suppose that any other method was deemed necessary. Either actual withdrawal to Spain or something equivalent to this declaration, therefore, should be required of the son upon attaining majority just as under the treaty it was required of the father himself. The option of the minor at majority must be independent and free. Wharton, Confl. L. 3d ed. § 10½; Morse, Citizenship, §§ 104, 112, 113.

What the petitioner actually did was to register himself as a Spanish subject on the books of the Spanish consulate. A consul is a public agent who is ordinarily clothed with authority only for commercial purposes. 2 Cyc. 271. His office is an

important one, but it is administrative rather than judicial. As a general rule the principles of international law afford no warrant for the exercise of judicial powers by consuls. 2 Cyc. 274. Such power is usually conferred upon the consuls of Christian nations in heathen lands, and the importance of such courts has been always recognized. In Re Ross, 140 U. S. 453, 35 L. ed. 581, 11 Sup. Ct. Rep. 897. The Treaty of Paris provides in art. 14 that "Spain shall have the power to establish consular officers in the ports and places of the territories, the sovereignty over which has been either relinquished or ceded by the present treaty." Before the war the consuls had no judicial power, and none is conferred upon them by this treaty. The courts of record are spoken of in art. 8 as already existing, while consuls under art. 14 were yet to be provided. It has been decided under the Treaty with France, whose principles are not essentially different from the general international law, that while a subpœna duces tecum may issue to a consul it can only be to produce a paper which is not official. Re Dillon, 7 Sawy, 561, Fed. Cas. No. 3,914. The constitutional right of an accused to process for the attendance of witnesses extends to their bringing with them such papers as may be material for the defense. Durr's Trial, 4 Cranch, 470, 2 L. ed. 684, Fed. Cas. No. 14,693. A register of Spanish citizens kept by the consul according to Spanish law must be an official paper, and its production therefore could not be compelled by an American court. It is not a public record for American purposes. This being so, it follows without question that the consular entry in the case at bar is neither such a record nor from such a court as is contemplated by art. 9 of the Treaty of Paris. It is doubtless true

X. Porto Rico.—35.

Ex Parte Garcia.

that as a treaty is made in general terms, the contemporaneous construction of it by the parties signatory will have great weight. If it was shown that even the entry in the consular books was notified to the American government and recognized by it as proper record under the treaty, this construction might be accepted; but nothing of the sort is shown, and it is quite probable that nothing of the sort was ever attempted. It follows, therefore, that such a consular entry is not that of a court of record under the treaty.

13. Moreover, the most that can be claimed for such a right of election is that it shall be exercised by the minor upon attaining his majority. It seems that majority under the Spanish law (Civil Code, § 320) is twenty-three years, and that the petitioner exercised his right just within twenty-three years from the ratification of the treaty of peace. On the other hand under the American law, and under the law in Porto Rico as contained in the Civil Code as amended, majority occurs at twenty-one years, and petitioner did not conform to this limitation by almost two years. Which would control?

Everyone living in America is subject to American laws. This is certainly true of the petitioner as to all civil rights, of inheritance and the like, and this has been interpreted as extending to majority. Udny v. Udny, L. R. 1 H. L. S. C. App. Cas. 441, 457, 9 Eng. Rul. Cas. 782. Story, Confl. L. § 103. The provision of the treaty is that all Spaniards remaining in Porto Rico become Americans, with the exception of a few who must signify their choice, and it cannot be held that after eighteen years Spanish law controls in the exercise of this or any other right in Porto Rico. American law is supreme here, and any right dependent upon majority must be decided according

Ex parte Garcia.

to American law. Light is thrown on this by the existing Organic Act, the Jones Bill (§ 5), which allows children of aliens to become Americans by taking the oath of allegiance within a year after attaining majority. This court has construed the provision as meaning twenty-one years, majority under the American law, recognized elsewhere in this act itself. Legislation is not to be construed as providing two different majorities for Frenchmen and Spaniards in this country. Indeed the court has construed § 5 as applicable also to Spaniards, and cannot now construe the treaty as allowing one age and the Jones Bill as allowing another for the same act of choosing nationality. Under this view the petitioner is too late in making his claim.

The bona fides of the claim when made need not be entered into. It was not made until he had been summoned to the colors of the country which had afforded him protection during practically all his minority, and thereupon he registers himself with the Spanish consulate as a Spanish subject. Treaties are not designed to protect bad faith. United States v. The Amistad, 15 Pet. 518, 10 L. ed. 826. Without regard to the bona fides, however, it would seem that he registered too late and before the wrong official. In Porto Rico it seems such claims of exemption because of Spanish citizenship are 137 in number, but of these only forty are registered in the consulate. It may be added that no construction will be adopted that will encourage anything like expatriation in war time, for that is illegal. 34 Stat. at L. 1228, chap. 2534, Comp. Stat. 1916, § 3958.

The conclusion seems to be, therefore, that when the Treaty of Paris permitted natives of the Peninsula to retain their nationality, this embraced or implied also the choice provision-

ally of the nationality of their minor children, but that this imposed upon these minors the duty of making a final choice of nationality when they arrived at the age of twenty-one years. The choice was to be made by the father and the child on the respective dates by means of a declaration made before a court of record, and therefore the registry by the son of himself as a Spaniard upon the privileged books of the Spanish consulate, especially when made two years after he attained his majority, and also after he had been called to the American colors, did not amount to a choice of Spanish citizenship within the purview of the Treaty of Paris.

It is unnecessary, therefore, to rest the decision of the case upon the literal wording of that treaty provision which declares that Congress shall determine the status of the "native inhabitants." If the petitioner as the son of a Spaniard was during minority of Spanish nationality under the prior clause of the treaty, he has not retained that status, and thus the same result follows under either view. The status of one claiming under the native inhabitant clause may be left for consideration when the case arises of a minor who at majority has properly signified his election of Spanish citizenship.

It follows that the petitioner did not take the steps required by the Treaty of Paris, and therefore did not retain Spanish citizenship. His petition must be denied.

It is so ordered.